UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
----------------------------------X
SECURITIES AND EXCHANGE COMMISSION,:
            Plaintiff,        :    CIVIL NO.
                              :
       v.                     :
                              :    3:04 CV 1342 (EBB)
WILLIAM A. DIBELLA AND NORTH COVE :
VENTURES, LLC.,               :
            Defendants.       :
----------------------------------X
```

**<u>RULING ON DEFENDANTS' MOTION TO DISMISS</u>**

**I.   <u>Introduction</u>**

The Defendants, William A. DiBella ("DiBella") and North Cove Ventures, LLC ("North Cove") (collectively, "Defendants"), filed a motion to dismiss the Securities and Exchange Commission's ("SEC") complaint alleging that Defendants aided and abetted violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, thereunder, by Paul J. Silvester, and violations of section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") by Thayer Capital Partners ("Thayer"). The Defendants claim that the SEC failed to allege any primary securities violations, such as material omissions by Silvester or Thayer or fraudulent conduct in connection with securities sales, or that Defendants provided knowing and substantial assistance to Silvester or Thayer, all of which is required to establish liability for aiding and abetting. The Defendants also claim that the SEC failed to plead fraud with the

level of particularity required by Federal Rule of Civil Procedure 9(b).  This court disagrees with Defendants. Defendants' motion is <u>denied</u>.

## II.  <u>Factual Background</u>

Silvester served as Treasurer for the State of Connecticut from July 1997 until January 1999.  Compl. ¶ 13.  Prior to his service as Treasurer, Silvester held the position of Deputy Treasurer from January 1995 until July 1997.  <u>Id.</u>  In his capacity as State Treasurer, Silvester was required to make investment decisions for the benefit of, *inter alia*, the Connecticut Retirement and Trust Funds ("Pension Fund").  The Pension Fund consisted of approximately $18 billion in assets held in numerous funds for approximately 150,000 Connecticut state and municipal employees.  Compl. ¶ 16.  An Investment Advisory Council was responsible for reviewing and evaluating investments proposed by the Connecticut Treasurer regarding the Pension Fund.  Compl. ¶ 17.

Thayer is a private equity firm based in Washington, D.C. Compl. ¶ 14.  Thayer's clients invest in funds organized by Thayer.  <u>Id.</u>  TC Partners IV is the general partner of Thayer IV, an $880 million private equity fund.  <u>Id.</u>  The Pension Fund, under Silvester's management, purchased a limited partnership interest in Thayer IV in late November 1998.  <u>Id.</u>  TC Management IV manages and receives fees from Thayer IV.  <u>Id.</u>  Fred Malek is

the chairman of Thayer and each of the aforementioned Thayer affiliates.

DiBella introduced Silvester to the president of Paine Webber in or around the fall of 1997.  Compl. ¶ 19.  Pursuant to that meeting, Silvester ultimately invested $100 million of Pension Fund assets in a private equity deal with Paine Webber. Id.  Silvester and DiBella both were under the impression that DiBella would receive a "finder's fee" in exchange for his placement services in the Paine Webber deal.  Id.

By August of 1998, Thayer had begun soliciting the Connecticut Treasurer's office for an investment in Thayer IV. Compl. ¶ 20.  The state's treasury investment officer, Michael MacDonald, determined that the state should decline the proposed Thayer investment.  Id.  Nonetheless, Silvester decided MacDonald should perform a due diligence review of the proposed Thayer IV investment.  Id.  Thereafter, in mid-November, MacDonald recommended an investment in Thayer IV of up to $25 million. Compl. ¶ 22.  Also at this time, the Treasurer's Office had negotiated and prepared the necessary closing documents to complete the Thayer IV investment deal.[1]  Id.

On or around November 10, 1998, both Silvester and DiBella discovered that DiBella would not receive the finder's fee from

---

[1] Silvester was to be replaced in January 1999 as he had just recently lost the 1998 State Treasurer election.  Compl. ¶ 21.

Paine Webber that they were anticipating.  Compl. ¶ 23.
Silvester then began to make arrangements to include DiBella in
the Thayer-Pension Fund deal.  Id.  On November 11, 1998,
Silvester telephoned Malek and indicated that the Thayer-Pension
Fund investment was going forward, likely in the amount of $50
million.  Compl. ¶ 25.  Silvester also suggested to Malek that
Thayer should hire DiBella to help with the incoming
administration.  Id.  Thereafter, Silvester instructed DiBella to
call Malek and negotiate a deal as a finder or placement agent
for the Thayer-Pension Fund deal.  Compl. ¶ 26.  DiBella and
Malek later met and negotiated a compensation package worth 0.7%
of the total Pension Fund investment in Thayer IV, to be paid to
DiBella through North Cove Ventures, LLC (Thayer-North Cove
deal).[2]  Compl. ¶ 27.  Thereafter, Silvester increased the
Pension Fund investment to $75 million, which resulted in an
increase in DiBella's fee.  Compl. ¶ 30.  The investment deal
closed on November 30, 1998, when TC Partners IV signed the
relevant closing documents.  Compl. ¶ 30.  In January 1999, the
newly elected Treasurer reduced the amount of the Pension Fund
investment from $75 million to $53.5 million.  Compl. ¶ 31.  This
reduced DiBella's fee from $525,000 to $374,500, the balance of
which Thayer paid in March 1999.  Id.

---

[2] North Cove Ventures, LLC, which is headquartered in
Wethersfield, CT, is DiBella's consulting firm.

The SEC claims that Silvester increased the Pension Fund's investment for the sole purpose of increasing DiBella's fee.  Id. The SEC also claims that DiBella's involvement in the Thayer-Pension Fund deal was strictly a means to repay him for past services and anticipated future services, and that Silvester, DiBella, and Thayer never contemplated DiBella would provide any meaningful work in relation to the Thayer-Pension Fund investment.  Compl. ¶ 33.  This, the SEC claims, establishes that the Thayer-North Cove deal was fraudulent.  Compl. ¶ 33. According to the SEC, both Thayer and Silvester had a duty to disclose the Thayer-North Cove deal to the Pension Fund and each failed to make the required disclosure.  Compl. ¶ 33-35.  The SEC claims that this failure breached their respective fiduciary duties and constituted a violation of section 10(b) of the Exchange Act, Rule 10b-5, thereunder, and section 206(2) of the Advisers Act.

## III. **Standard of Review**

### A. **Fed.R.Civ.P. 12(b)(6)**

Dismissal under Rule 12(b)(6) is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Hartford Fire Ins. Co. v. California, 509 U.S. 764, 811 (1993); Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  A motion to dismiss tests the legal sufficiency of the complaint, not the weight of

the evidence which might be offered in support thereof at trial.
See Neitzke v. Williams, 490 U.S. 319, 327 (1989); Hishon v. King
& Spalding, 467 U.S. 69, 73 (1984).  The Court must accept all
factual allegations in the complaint as true and draw all
reasonable inferences in favor of the nonmovant.  See Scheuer v.
Rhodes, 416 U.S. 232, 236 (1974); Cruz v. Beto, 405 U.S. 319, 322
(1972); Negron-Gaztambide v. Hernandez-Torres, 35 F.3d 25, 27
(1st Cir. 1995).  Dismissal may be based on either: (1) the lack
of a cognizable legal theory; or (2) the absence of factual
allegations to support a claim.  See Balistreri v. Pacifica
Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988); Corporate Health
Ins., Inc. v. Texas Dep't of Ins., 12 F.Supp.2d 597, 604 (S.D.
Tex. 1998).

To withstand a motion to dismiss, a complaint must allege
facts setting forth all of the essential elements of a viable
legal theory – the facts alleged must establish a prima facie
case.  See Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir.
1988); Gray v. County of Dane, 854 F.2d 179, 182 (7th Cir. 1988).
While the federal rules envision a liberal pleading standard,
bald assertions and conclusions of law will not defeat a motion
to dismiss.  See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996);
Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  Courts may
not assume that a litigant can prove facts not alleged or that
the defendant has violated laws in ways that the litigant has not

pleaded.  See Papason v. Allain, 478 U.S. 265, 286 (1986);
Associated Gen. Contractors v. California State Council of
Carpenters, 459 U.S. 519, 526 (1983).  "A complaint which
consists of conclusory allegations unsupported by factual
assertions fails even the liberal standard of Rule 12(b)(6)."
DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996).

**IV.   DISCUSSION**

   **A.   Aiding and Abetting A Violation of the Securities Laws.**

       The SEC may bring a civil action against "any person that
knowingly provides substantial assistance to another person in
violation of a provision of [the securities laws] or of any rule
or regulation issued" thereunder.  15 U.S.C. 78t(e).  In at least
three distinct ways, Defendants challenge the SEC's complaint,
claiming it failed to state a claim upon which relief can be
granted and should be dismissed under Rule 12(b)(6).  First,
Defendants claim that the SEC failed properly to allege any
primary violations by Silvester or Thayer that DiBella could have
aided and abetted.  Second, even if the SEC properly alleged the
underlying primary violations, Defendants claim that the SEC
failed properly to allege that DiBella acted with the requisite
level of scienter to establish aiding and abetting liability.
Third, Defendants claim that the SEC failed properly to allege
that DiBella "substantially assisted" Silvester and Thayer in the
commission of the alleged primary violations.  Without a primary

violation, knowing assistance, and substantial assistance, an aiding and abetting allegation will not stand.

### 1.   **Primary Violations**

In order to properly plead aiding and abetting liability, the SEC must allege a securities law violation by a primary party.  <u>SEC v. Militano</u>, 773 F.Supp. 589, 594 (S.D.N.Y. 1991). Defendants claim that the SEC failed properly to allege that either Silvester or Thayer committed a violation of the securities laws and, therefore, Defendants cannot be held liable for aiding and abetting.  Defs. Mem. at 4-5.  The underlying primary violations alleged by the SEC are 1) Silvester's failure to disclose to the Pension Fund the existence of the agreement with DiBella, an alleged material omission in violation of Rule 10b-5(b), 2) Silvester's conduct that operated as a fraud and deceit on the Pension Fund, an alleged violation of Rule 10b-5(c), and 3) Thayer's failure to disclose the Thayer-North Cove deal to the Pension Fund, an alleged violation of Section 206(2) of the Advisers Act.  Compl. ¶¶ 2-3, 33, 35.  The SEC claims that DiBella knew of these primary violations.  Compl. ¶ 34, 36.

In its memorandum in support of the underlying motion to dismiss, Defendants claim that any omissions made by Silvester and/or Thayer were not material and, therefore, did not constitute a violation of either section 10(b) of the Securities Exchange Act of 1934 or section 206(2) of the Investment Advisers

Act of 1940.  Defs. Mem. at 5.  Defendants also claim that the
SEC failed to allege that Silvester employed any manipulative or
deceptive devices "in connection with" the purchase or sale of
the Thayer IV interest, or that Thayer utilized any act,
practice, or course of business which operated as a fraud or
deceit "in connection with" the provision of investment advice.
Defs. Mem. at 14.  Since the conduct at the heart of the SEC's
complaint was, the Defendants claim, too attenuated "in
substance," it could not have occurred in connection with the
sale of the Thayer IV partnership interest.  Defs. Mem. at 10.

    The SEC also claims that Silvester violated sections (a) and
(c) of Rule 10b-5, which do not involve omissions of any kind,
but rather prohibit schemes to defraud.  This fraudulent conduct
alone, the SEC contends, constitutes a primary violation of the
securities laws, regardless of whether or not any material
omissions were made.

        a.  *Material Omissions*

    Under section 10(b) and Rule 10b-5,[3] a fact is considered

_____

    [3] "It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality of
interstate commerce, or of the mails or of any facility of any
national securities exchange, (a) [t]o employ any device, scheme,
or artifice to defraud, (b) [t]o make any untrue statement of a
material fact or to omit to state a material fact necessary in
order to make the statements made, in the light of the
circumstances under which they were made, not misleading, or (c)
[t]o engage in any act, practice, or course of business which
operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."  17

material if there is a substantial likelihood that the disclosure
of the omitted fact would be viewed by a reasonable investor as
having significantly altered the "total mix" of information
available.  Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988).
"A statement or omission will be considered material if there is
a substantial likelihood that a reasonable investor would
consider it important in making an investment decision."
Malhotra v. Equitable Life Assurance Soc'y of America, 364
F.Supp.2d 299, 309 (S.D.N.Y. 2005) (internal citations omitted).
"[A] complaint may not properly be dismissed pursuant to Rule
12(b)(6) on the ground that the alleged misstatements or
omissions are not material unless they are so obviously
unimportant to a reasonable investor that reasonable minds could
not differ on the question of their importance."  Goldman v.
Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  "Only if no
reasonable juror could determine that the undisclosed
[information] would have assumed actual significance in the
deliberations of the reasonable [investor] should materiality be
determined as a matter of law."  Press v. Chemical Inv. Servs.
Corp., 166 F.3d 529, 538 (2d Cir. 1999).

     Congress has made a clear statement, through the enactment
of the Investment Advisers Act of 1940, of its desire to
"eliminate conflicts of interest between the investment adviser

_____

C.F.R. § 240.10b-5.

and the clients as safeguards both to unsophisticated investors and to bona fide investment counsel." <u>SEC v. Capital Gains Research Bureau, Inc.</u>, 375 U.S. 180, 191 (1963).  "The Investment Advisers Act of 1940 thus reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship, as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested." <u>Id.</u> at 191-92.

Defendants claim that DiBella's involvement in the Thayer-Pension Fund deal would not have affected the merits or soundness of the Pension Fund investment in Thayer IV.  DiBella's arrangement with Thayer did not affect the value of the Thayer IV portfolio companies, Defendants claim, and therefore the investment in Thayer IV would have performed just as it did regardless of whether or not DiBella was involved in the deal and/or his involvement was disclosed to the Pension Fund. Defendants claim that since DiBella's involvement did not affect the investment, the disclosure of that information would not have been viewed as material to a reasonable investor deciding whether or not to invest in Thayer IV.

The SEC claims that Silvester made the underlying investment decisions in order to benefit his longtime political supporter and friend despite his owing a fiduciary duty to the Pension

Fund.  Compl. ¶ 1.  The SEC alleges that Silvester had a conflict of interest because his investment decisions should only have been made with the intention of increasing the value of the Pension Fund, but instead he chose to use Pension Fund assets to provide a financial reward to DiBella.[4]  Further, the SEC claims that Silvester involved DiBella with the understanding that DiBella "would not provide any meaningful work in exchange for the fees he received from Thayer."  Compl. ¶ 2.  The SEC also claims that, despite this apparent conflict, "Silvester [and Thayer] failed to disclose this arrangement to the Pension Fund."  Compl. ¶ 2, 3.

"Only if no reasonable juror could determine that the undisclosed [information] would have assumed actual significance in the deliberations of the reasonable [investor] should materiality be determined as a matter of law." Press, 166 F.3d at 538; Basic, 485 U.S. at 231.  If true, it is certainly possible that a reasonable Pension Fund investor would want to know prior to investing that the Treasurer, who is responsible for making investment decisions on behalf of the Pension Fund, allegedly entered into an agreement whereby he increased the Pension Fund's

_____

[4] "Silvester made this arrangement for several reasons: to compensate DiBella for his role in the unrelated Pension Fund investment with Paine Webber; to repay political favors DiBella had provided Silvester in the past; and to curry favor with DiBella ... whom [sic] Silvester believed would be helpful to his career in the future."  Compl. ¶ 24.

investment by $25 million solely to provide his friend a larger finder's fee.  This becomes more relevant given the allegation that DiBella was never required to perform any services in exchange for the finder's fee.  This arrangement could indicate that Silvester has a conflict of interest and might be incapable of making sound and uninfluenced investment decisions for the benefit of the Pension Fund.  An investor might wonder if Silvester could have negotiated a reduction of the fees that the Pension Fund paid to Thayer.  Such an investor might question the wisdom or appropriateness of the increased investment if it was truly made only to benefit DiBella.  Did that decision render the investment too risky?

The SEC has sufficiently alleged facts that, if true, could constitute material omissions by Silvester and Thayer.  The Defendants' motion to dismiss based on the SEC's failure properly to allege material omissions is denied.

> *b.   Primary Violator's Conduct "In Connection With"*
> *The Purchase or Sale of The Thayer IV Interest.*

Section 10(b) of the Securities Exchange Act of 1934 prohibits the use of any manipulative or deceptive device that contravenes a SEC rule or regulation *in connection with the purchase or sale of any security*.  15 U.S.C. § 78j(b) (emphasis added).  The Supreme Court in <u>SEC v. Zandford</u>, 535 U.S. 813 (2002), held that Congress' intent when it passed the Securities Exchange Act of 1934 was to promote the confidence of the

American public in the securities markets and to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." Zandford, at 819; Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 151 (1972). Where a sale of securities and a fraudulent act are not independent, the "in connection with" requirement is satisfied and liability exists under section 10(b) of the Exchange Act. Zandford, 535 U.S. at 820-21. A fraudulent scheme that coincides with the sale of securities satisfies the "in connection with" requirement of section 10(b) and Rule 10b-5. Id. at 825; SEC v. Santos, 355 F.Supp.2d 917, 920 (N.D. Ill. 2003).

The defendant in Zandford was alleged to have sold securities belonging to a client for the purpose of transferring the proceeds of those sales to an account that the defendant controlled. Zandford, 535 U.S. at 815. Zandford claimed that, since the sales were each completely lawful and that any alleged fraud took place after the securities were sold when Zandford appropriated the funds for his benefit, the fraud and the sale were separate and independent transactions, and the SEC failed to allege the "in connection with" requirement of Rule 10b-5 and section 10(b). Id. at 820-21. The Zandford court disagreed. Even though the securities sales were completely lawful, they were made in order to effectuate the fraud contemplated by

14

Zandford, namely, depriving his client of funds.  Zandford wrote checks to himself, with the knowledge that redeeming the checks would require the sale of securities, and then deposited them. Id. at 821.  The sales, therefore, occurred only because Zandford was conducting a fraudulent scheme.  The sales were part of the process by which Zandford intended to, and did, wrongfully deprive his client of assets.  Id.

In Santos, the defendant broker-dealers, Burns and Hollendoner, were alleged to have directly and indirectly provided cash payments and campaign contributions to Santos, Chicago's City Treasurer, in exchange for Santos' investment of city assets with Burns' and Hollendoner's investment firm.[5] Santos, at 920.  Burns and Hollendoner claimed that, since the securities sales themselves were in fact legitimate, the SEC failed to allege the "in connection with" requirement of a section 10(b) and/or Rule 10b-5 violation.  Id.  The court found that "the 'in connection with' requirement is met where the defendant engages in a scheme to defrauds [sic] his client even though the related securities transactions were completely legitimate."  Id.

Here, DiBella claims that he had nothing to do with the

---

[5] Allegedly, the defendants "made illegal payments to Santos to secure the City's investment business, invested the City money allocated to them by Santos, and made commissions on those investments."  Santos, 355 F.Supp.2d at 920.

actual sale of the Thayer IV interest to the Pension Fund and
that the sale itself was legitimate.  Defs.' Mem. at 11.  He
claims that Silvester and Thayer had already negotiated,
prepared, and virtually completed the Thayer-Pension Fund deal
prior to DiBella's involvement, and that DiBella's contemplated
role was limited to post-sale services.  Defs.' Mem. at 10.
Therefore, Defendants claim, DiBella's fee arrangement had no
effect on the underlying sale of the Thayer IV partnership
interest and was not developed in connection with the Thayer-
Pension Fund deal.  Id.  Defendants claim that the SEC has
admitted that the Defendants' deal with Thayer did not affect the
Thayer-Pension Fund deal by virtue of the SEC's allegation that
DiBella performed "no meaningful work" in connection with the
Pension Fund's deal.  Defs.' Mem. at 11.  It is the Defendants'
assertion that the allegation that no meaningful work was
performed requires the conclusion that the allegedly fraudulent
arrangement with DiBella was completely independent of the
Thayer-Pension Fund deal.  According to Defendants, since the fee
arrangement did not require DiBella to perform any meaningful
work related to the Thayer-Pension Fund deal, the SEC failed to
allege both a violation of section 10(b) and Rule 10b-5, and the
aiding and abetting by DiBella of such a violation.  Defendants
suggest that if DiBella's involvement in this scheme would not
constitute "meaningful work" with respect to the Thayer-Pension

Fund deal, it cannot be considered substantial assistance in connection with the purchase or sale of securities.  This Court does not agree.

The SEC alleges in the Complaint that, while Silvester had indicated his intention to invest Pension Fund assets in Thayer IV prior to DiBella's involvement, Silvester's goals for the investment changed once he involved DiBella in the deal.  Compl. ¶ 24-30.  His intended achievements included, not only the increase in value of the Pension Fund, but also the compensation of a friend.  According to the Complaint, DiBella urged Silvester to increase the investment because of the effect an increase would have on his fee arrangement.  Therefore, according to the Complaint, the primary violations include the failure to disclose the Thayer-North Cove agreement to the Pension Fund before *purchasing the Thayer IV interest*, and the concoction of a fraudulent scheme by which Silvester would use Pension Fund assets to *purchase the Thayer IV interest* and Thayer would, in turn, pay a finder's fee to DiBella without requiring any meaningful work.  The Thayer-North Cove deal was included in the negotiation of the Pension Fund's investment between Silvester and Thayer, and was born out of Silvester's original plans to invest in Thayer IV.  The Complaint adequately alleges primary violations that occurred in connection with the sale of the Thayer securities.

The SEC has sufficiently pled the "in connection with" requirement.

        *c.   Primary Violator's Conduct "In Connection With" The Provision of Investment Advice.*

The Defendants also claim that the SEC failed properly to allege that Thayer's violation of section 206(2) of the Advisers Act occurred "in connection with" the provision of investment advice.  Defs. Mem. at 14-15.

The SEC need not prove Thayer's primary violation of section 206 of the Investment Advisers Act of 1940 was "in connection with" the provision of investment advice.  This element is not required in order to establish a violation of section 206(2), and therefore is not required to properly allege DiBella's aiding and abetting Thayer's primary violation of that section.  <u>See Abrahamson v. Fleschner</u>, 568 F.2d 862, 877 (2d Cir. 1976) (holding appellees relied on a case that was inapplicable because 1) that case "was based on the express language of Section 10(b) and Rule 10b-5 requiring a fraud 'in connection with the purchase or sale of any security,'" 2) the case in front of the <u>Abrahamson</u> court was based on Section 206 of the Advisers Act and Rule 206(4)-1 thereunder, and 3) "[n]either Section 206 ... nor Rule 206(4)-1 contains any such requirement.")

Section 206(2) contains no requirement that a violation of that section occur in connection with the provision of investment advice.  Section 206(2) states only "[i]t shall be unlawful for

any investment adviser . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ." 15 U.S.C. § 80b-6.  In any event, for the reasons mentioned above, the SEC has sufficiently alleged the in connection requirement as it pertains to Silvester and Thayer.

Therefore, Defendants' motion to dismiss the Complaint based on the claimed failure by the SEC properly to allege primary violations in connection with the sale of securities is denied.

### 2.   Scienter

The SEC must allege actual knowledge by DiBella in order to properly allege aiding and abetting a violation of the securities laws.  The SEC has made sufficient allegations to satisfy this requirement.  DiBella, the SEC alleges, acted knowingly or with reckless disregard for the fact that Silvester was engaged in a fraud perpetrated on the investors in the Pension Fund.

The aiding and abetting statute, Section 20(e) of the Securities Exchange Act of 1934, allows the SEC to initiate a civil action against "any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title . . . ." 15 U.S.C. § 78t(e).  That section further provides that any person aiding and abetting a securities law violation "shall be deemed to be in violation of such

provision to the same extent as the person to whom such assistance is provided."  Id.

The Defendants take issue with the SEC's Complaint, claiming that the allegation of knowing or reckless conduct on the part of the Defendants is not sufficient to satisfy the scienter requirement.  Actual knowledge is required, Defendants claim, not recklessness, and pleading actual knowledge in the disjunctive is not permissible.

The standard for aiding and abetting liability is knowing conduct – or plainly reckless conduct where the defendant owed a fiduciary duty to the defrauded investors.  See e.g., Ross v. Bolton, 904 F.2d 819, 824 (2d Cir. 1990) ("As [the Second Circuit] said in IIT, if there is no fiduciary duty . . . the scienter requirement increases, so that appellants need to show that [the defendant] acted with actual intent"); IIT v. Cornfeld, 619 F.2d 909, 925 (2d Cir. 1980) ("When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved"); Edwards & Hanley v. Wells Fargo Sec. Clearance Corp., 602 F.2d 478, 485 (2d Cir. 1979) ("Finding a person liable for aiding and abetting a violation of 10b-5 . . . requires something closer to an actual intent to aid in a fraud, at least in the absence of some special relationship with the plaintiff that is fiduciary in nature");  SEC v. Milan Capital Group, Inc.,

2000 WL 1682761, at *9 (S.D.N.Y. Nov. 9, 2000) (finding Ross v. Bolton, which held that recklessness is insufficient for aiding and abetting liability where no fiduciary duty exists, is distinguishable because in Milan Capital, the defendant owed a fiduciary duty); SEC v. Lybrand, 200 F.Supp.2d 384, 400 (S.D.N.Y. 2002) ("In [the Second Circuit], it is well-established that recklessness satisfies the scienter requirement for aider and abettor liability when the alleged aider and abettor owes a fiduciary duty to the defrauded party . . . [and] where there is no fiduciary relationship, 'the scienter requirement scales upward – the assistance rendered must be knowing and substantial'").

In 1994, the United States Supreme Court ruled that Congress did not intend to impose liability for aiding and abetting under section 10(b) of the Securities Exchange Act.  Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 191 (1994).  In response to Central Bank, Congress enacted Section 20(e) of the Securities Exchange Act, which restored to the SEC the ability to bring civil actions for aiding and abetting violations of the securities laws.  "Courts applying Section [20(e)] have generally analyzed the provision in light of pre-Central Bank aiding and abetting case law." SEC v. Lybrand, 200 F.Supp.2d 384, 399 (S.D.N.Y. 2002), citing SEC v. Fehn, 97 F.3d 1276, 1286 (9th Cir. 1996) and Graham v. SEC, 222 F.3d 994, 1000

(D.C. Cir. 2000).

"[T]o state a claim against ... an aider and abettor ...,
[plaintiff] must allege, in addition to the securities law
violation by the primary wrongdoer, that [the aider and abettor]
knew of the wrong and substantially assisted in perpetrating it."
Ross, 904 F.2d at 824 (2d Cir. 1990).  The Ross court found that
despite allegations of recklessness on the part of the alleged
aider and abettor, without a fiduciary duty owed by an alleged
aider and abettor to the injured investors, there is no aiding
and abetting liability.  Id.  "When it is impossible to find any
duty of disclosure, an alleged aider-abettor should be found
liable only if scienter of the high 'conscious intent' variety
can be proved."  IIT, 619 F.2d at 925 (2d Cir. 1980).  "Finding a
person liable for aiding and abetting a violation of 10b-5, as
distinct from committing the violation as a principal, requires
something closer to an actual intent to aid in a fraud, at least
in the absence of some special relationship with the plaintiff
that is fiduciary in nature."  Edwards & Hanly, 602 F.2d at 485
(2d Cir. 1978).

For the SEC to establish aiding and abetting liability where
no fiduciary duty exists, it must allege and prove that DiBella
knew of the underlying fraud and substantially assisted in the
perpetration of that fraud on investors.  As the aforementioned
cases illustrate, in the Second Circuit, prior to Central Bank,

22

allegations of recklessness satisfied the scienter requirement for aiding and abetting liability only where the alleged aider and abettor had a fiduciary relationship with the plaintiff. "Absent such a relationship, the requisite level of intent was proportional to the remoteness of the actor from the fraudulent transaction." In re Leslie Fay Cos., Inc., 871 F.Supp. 686, 691 (S.D.N.Y. 1995).  With respect to aiders and abettors, "[t]he scienter requirement scales upward when activity is more remote; therefore, the assistance rendered should be both substantial and knowing." IIT, 619 F.2d at 923.

The SEC has alleged that DiBella knowingly aided and abetted the aforementioned fraudulent scheme by accepting a finder's fee without providing any work and persuading Silvester to increase the Pension Fund's investment for the sole purpose of increasing DiBella's fee.  DiBella, the SEC claims, so acted with knowledge that Silvester and Thayer had not, and would not, disclose this arrangement to the Pension Plan.  Compl. ¶ 34, 36.  According to the Complaint, Silvester telephoned DiBella and made him aware that DiBella could be involved in the Pension Fund-Thayer deal and that DiBella would not have to assist on the deal at all. Compl. ¶ 26.  The SEC claims Silvester instructed DiBella to request one percent of the Pension Fund investment in Thayer IV and that DiBella would not be required to perform any services in connection with this deal.  Id.  After receiving this

information, DiBella followed Silvester's instructions.  DiBella
met Malek in New York to discuss the proposed arrangement.
Compl. ¶ 27.  After DiBella and Thayer reached an agreement,
DiBella "pressured Silvester to increase the amount of the
Pension Fund's investment in Thayer IV solely to increase the
size of DiBella's fee."  Id.  DiBella, the SEC claims, was aware
of the underlying fraud and he persuaded Silvester to increase
the Pension Fund's investment for the sole purpose of increasing
his own fee.

The SEC's allegations in the Complaint are sufficient to
meet its scienter burden.

### 3.   Substantial Assistance

To establish an aiding and abetting claim, the SEC must also
allege that DiBella provided "substantial assistance" to
Silvester and Thayer in the performance of their fraudulent
scheme.  15 U.S.C. § 78t(e).  In other words, it must allege that
Defendants' conduct was a "substantial causal factor in the
perpetuation" of the underlying fraud.  Rolf v. Blyth, Eastman,
Dillon & Co., Inc., 570 F.2d 38, 49 (2d Cir. 1978).  "In alleging
the requisite 'substantial assistance' by the aider and abettor,
the complaint must allege that the acts of the aider and abettor
proximately caused the harm . . . on which the primary liability
is predicated."  Bloor v. Carro, Spanbock, Londin, Rodman & Fass,
754 F.2d 57, 62-63 (2d Cir. 1985).

The primary liability here is based on the allegedly fraudulent fee arrangement and the failure of Silvester and Thayer to make the proper disclosures.  As support for the aiding and abetting claim, the SEC alleges that DiBella substantially assisted Silvester and Thayer by agreeing to be included in a deal in which he would receive substantial fees despite performing no meaningful work, Compl. ¶ 26; meeting with Malek to negotiate DiBella's compensation package, Compl. ¶ 27; urging Silvester to increase his fee by increasing the Pension Fund's investment by $25 million, id.; signing the agreement under which DiBella was originally scheduled to be paid $525,000 after Silvester agreed to increase the investment, Compl. ¶ 29; and ultimately accepting payment despite having performed no work, Compl. ¶ 31-32.  As alleged, the primary violations would never have occurred if the Thayer-North Cove deal did not exist.  The alleged violations occurred when Silvester agreed to increase the investment for the benefit of DiBella and failed to disclose to the Pension Fund any aspect of DiBella's involvement in the investment.  Thus, DiBella's alleged willingness to participate, and subsequent participation, in the aforementioned activities constituted a substantial causal factor in the perpetuation of the underlying fraud.  In fact, as alleged, Silvester suggested to DiBella that he telephone Malek to begin negotiations of the deal, indicating that DiBella initiated contact with Thayer.

The SEC sufficiently alleged that DiBella knew of the fraudulent nature of the Thayer-Pension Fund deal but nonetheless participated in it by negotiating with Malek, urging an increase of the investment by Silvester, and accepting payment without providing meaningful assistance to the Pension Fund or Thayer. The SEC has properly alleged substantial assistance.

**B.  Rule 9(b)**

Where "the totality of the complaint sufficiently states a claim of fraud and provides [defendants] with adequate notice and direction to pursue relevant discovery," Rule 9(b) is satisfied. See SEC v. Schiffer, 1998 U.S. Dist. LEXIS 6339, at *11 (S.D.N.Y. 1998).  "While Fed. R. Civ. P. 8(a) requires only that plaintiffs set forth a short and plain statement of the claim showing that the pleader is entitled to relief, that Rule must be read in conjunction with Fed. R. Civ. P. 9(b) in actions including claims of fraud.  Federal Rule of Civil Procedure 9(b) requires that in all averments of fraud . . . the circumstances constituting fraud shall be stated with particularity." Lehman Bros. Commercial Corp. v. Minmetals Int'l, 1995 U.S. Dist. LEXIS 15185, at *4 (S.D.N.Y. Oct. 16, 1995) (internal quotation marks and citations omitted).  "This rule is intended to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." Id.

(Internal quotations marks and citations omitted).  "Rule 9(b) is not intended to be an insurmountable hurdle for claimants to overcome, but was designed to afford defendants fair notice of the fraud alleged against them."  Id. at *7 (internal quotation marks and citations omitted.)  "The particularity requirements of Rule 9(b) apply to allegations of aiding and abetting securities fraud."  Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 651 F.Supp. 877, 880 (D. Conn. 1986).

In its complaint, the SEC outlines with sufficient specificity the Defendants' involvement in the underlying fraud. It describes the who, what, when, where, why, and how of the allegedly fraudulent conduct.  The parties allegedly involved in the scheme include DiBella, North Cove Ventures, Silvester, Thayer, and Malek.  Compl. ¶ 1.  The alleged scheme involved the reward of Silvester's friend, DiBella, with a percentage of the total investment by Silvester of state pension fund assets in a private equity fund managed by Thayer while requiring no meaningful work from DiBella.  Compl. ¶ 1-3.  Silvester and Thayer allegedly failed to disclose the arrangement to the Pension Fund and DiBella allegedly knew of this omission.  Compl. ¶ 34, 36.  This activity took place during the period from November 1998 through January 1999 in and around Connecticut, New York, Virginia, and Washington, D.C.  Compl. ¶ 1, 11-15, 27.

"Malice, intent, knowledge, and other condition of mind of a

person may be averred generally." Fed. R. Civ. P. 9(b). The SEC alleges that Silvester's motive for including DiBella in the scheme was to repay him for past and future services, including his involvement in the Paine Webber deal, and to reward him for his friendship and support. Compl. ¶ 1, 24. DiBella's motive, allegedly, was to receive a substantial fee or fees without having to provide any meaningful work. Compl. ¶ 27, 33, 36. Silvester provided the opportunity when he contacted DiBella to invite him into the Thayer-Pension Fund deal. Compl. ¶ 24-26.

This Court is satisfied that the pleading requirements of Rule 9(b) and the succinctness demands of Rule 8 have been met. DiBella has been afforded fair notice of the alleged primary violations by Silvester and Thayer, and DiBella's conduct in support and assistance thereof.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss [Doc. No. 16] is hereby DENIED.


                              SO ORDERED

                              _____
                              ELLEN BREE BURNS
                              SENIOR U.S. DISTRICT JUDGE


Dated at New Haven, Connecticut this ___ day of November, 2005.