UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------------X
SECURITIES AND EXCHANGE COMMISSION,:
               Plaintiff,          :    CIVIL NO.
                                   :
          v.                       :
                                   :    3:04 CV 1342 (EBB)
WILLIAM A. DIBELLA AND NORTH COVE  :
VENTURES, LLC.,                    :
               Defendants.         :
-----------------------------------X
```

## RULING ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION TO STRIKE

## I.   Introduction

     The Defendants, William A. DiBella ("DiBella") and North
Cove Ventures, LLC ("North Cove") (collectively, "Defendants"),
filed a motion for summary judgment and to strike various claims
in the Securities and Exchange Commission's ("SEC") complaint.
The complaint alleges that Defendants aided and abetted
violations of section 10(b) of the Securities Exchange Act of
1934 ("Exchange Act") and Rule 10b-5 by Paul J. Silvester, and
violations of section 206(2) of the Investment Advisers Act of
1940 ("Advisers Act") by Thayer Capital Partners ("Thayer").  The
Defendants claim that the SEC's complaint is time barred, that
the SEC does not have the authority to seek disgorgement, and
that, even if it did have such authority, the SEC failed to
allege sufficient facts to support its disgorgement claim.
Finally, the Defendants claim that the SEC is estopped from
claiming that DiBella acted with the requisite scienter when

aiding and abetting the underlying securities violation by Thayer.

## II.  __Factual Background__

The following factual background is substantially similar to the facts described by this Court it its recent ruling on the Defendants' motion to dismiss.

Silvester served as Treasurer for the State of Connecticut from July 1997 until January 1999.  Compl. ¶ 13.  Prior to his service as Treasurer, Silvester held the position of Deputy Treasurer from January 1995 until July 1997.  Id.  In his capacity as State Treasurer, Silvester was required to make investment decisions for the benefit of, *inter alia*, the Connecticut Retirement and Trust Funds ("Pension Fund").  The Pension Fund consisted of approximately $18 billion in assets held in numerous funds for approximately 150,000 Connecticut state and municipal employees.  Compl. ¶ 16.  An Investment Advisory Council was responsible for reviewing and evaluating investments proposed by the Connecticut Treasurer regarding the Pension Fund.  Compl. ¶ 17.

Thayer is a private equity firm based in Washington, D.C. Compl. ¶ 14.  Thayer's clients invest in funds organized by Thayer.  Id.  TC Partners IV is the general partner of Thayer IV, an $880 million private equity fund.  Id.  The Pension Fund, under Silvester's management, purchased a limited partnership

2

interest in Thayer IV in late November 1998.  Id.  TC Management
IV manages and receives fees from Thayer IV.  Id.  Fred Malek is
the chairman of Thayer and each of the aforementioned Thayer
affiliates.

DiBella introduced Silvester to the president of Paine
Webber in or around the fall of 1997.  Compl. ¶ 19.  Pursuant to
that meeting, Silvester ultimately invested $100 million of
Pension Fund assets in a private equity deal with Paine Webber.
Id.  Silvester and DiBella both were under the impression that
DiBella would receive a "finder's fee" in exchange for his
placement services in the Paine Webber deal.  Id.

By August of 1998, Thayer had begun soliciting the
Connecticut Treasurer's office for an investment in Thayer IV.
Compl. ¶ 20.  The state's treasury investment officer, Michael
MacDonald, determined that the state should decline the proposed
Thayer investment.  Id.  Nonetheless, Silvester decided MacDonald
should perform a due diligence review of the proposed Thayer IV
investment.  Id.  Thereafter, in mid-November, MacDonald
recommended an investment in Thayer IV of up to $25 million.
Compl. ¶ 22.  Also at this time, the Treasurer's Office had
negotiated and prepared the necessary closing documents to
complete the Thayer IV investment deal.[1]  Id.

---

[1] Silvester was to be replaced in January 1999 as he had
just recently lost the 1998 State Treasurer election.  Compl. ¶
21.

3

On or around November 10, 1998, both Silvester and DiBella discovered that DiBella would not receive the finder's fee from Paine Webber that they were anticipating.  Compl. ¶ 23. Silvester began to make arrangements to include DiBella in the Thayer-Pension Fund deal.  <u>Id.</u>  On November 11, 1998, Silvester telephoned Malek and indicated that the Thayer-Pension Fund investment was going forward, likely in the amount of $50 million.  Compl. ¶ 25.  Silvester also suggested to Malek that Thayer should hire DiBella to help with the incoming administration.  <u>Id.</u>  Thereafter, Silvester instructed DiBella to call Malek and negotiate a deal as a finder or placement agent for the Thayer-Pension Fund deal.  Compl. ¶ 26.  DiBella and Malek later met and negotiated a compensation package worth 0.7% of the total Pension Fund investment in Thayer IV, to be paid to DiBella through North Cove Ventures, LLC (Thayer-North Cove deal).[2]  Compl. ¶ 27.  Thereafter, Silvester increased the Pension Fund investment to $75 million, which resulted in an increase in DiBella's fee.  Compl. ¶ 30.  The investment deal closed on November 30, 1998, when TC Partners IV signed the relevant closing documents.  Compl. ¶ 30.  In January 1999, the newly elected Treasurer reduced the amount of the Pension Fund investment from $75 million to $53.5 million.  Compl. ¶ 31.  This

---

[2] North Cove Ventures, LLC, which is headquartered in Wethersfield, CT, is DiBella's consulting firm.

reduced DiBella's fee from $525,000 to $374,500, the balance of which Thayer paid in March 1999.  Id.

The SEC claims that Silvester increased the Pension Fund's investment for the sole purpose of increasing DiBella's fee.  Id. The SEC also claims that DiBella's involvement in the Thayer-Pension Fund deal was strictly a means to repay him for past services and anticipated future services, and that Silvester, DiBella and Thayer never contemplated DiBella would provide any meaningful work in relation to the Thayer-Pension Fund investment.  Compl. ¶ 33.  According to the SEC, both Thayer and Silvester had a duty to disclose the Thayer-North Cove deal to the Pension Fund, and they each failed to make the required disclosure.  Compl. ¶ 33-35.  The SEC claims that this failure breached their respective fiduciary duties and constituted a violation of section 10(b) of the Exchange Act, Rule 10b-5, thereunder, and section 206(2) of the Advisers Act.  DiBella, Plaintiff claims, aided and abetted these violations in order to receive a substantial sum of money.  Pursuant to the SEC's investigation into this matter, the parties executed a Tolling Agreement, which, after various attempts, was finally signed by the Defendants and their attorney on December 8, 2003.  The SEC signed the Tolling Agreement on December 10, 2003.

III. **Standard of Review**

    A.    **Fed.R.Civ.P. 56(c) - Motion for Summary Judgment.**

    In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  See also Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

    If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 322-23.  However, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

    The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party . . . ."  Aldrich

v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992), *cert. denied*, 506 U.S. 965 (1992); Heilweil v. Mt. Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255, quoted in Keeney v. City of New London, 196 F.Supp.2d 190, 195 (D. Conn. 2002).

"[T]he requirement is that there be no *genuine* issue of *material* fact.  As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original).  When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### B.   Fed. R. Civ. P. 12(f) - Motion to Strike.

Rule 12(f) allows the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "Rule 12(f) motions are not favored and will not be granted routinely." SEC v. Lorin, 869 F.Supp. 1117, 1120 (S.D.N.Y. 1994).

## IV.   <u>DISCUSSION</u>

### A.   <u>Statute of Limitations.</u>

### 1.   **Section 2462 Does Not Apply To Disgorgement Actions By The SEC.**

The Defendants assert that the claims brought by the SEC are subject to the five-year statute of limitations found in 28 U.S.C. § 2462.  The SEC, on the other hand, maintains that, even if some of its claims are covered by section 2462, the disgorgement claim is beyond that statute's reach.  The language of section 2462 reads as follows:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any **civil fine, penalty, or forfeiture,** pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462 (emphasis added).

For the five-year statute of limitations to apply to the SEC's claims, they must seek to impose a "civil fine, penalty, or forfeiture."  28 U.S.C. § 2462.  The SEC claims that disgorgement is strictly remedial, it does not qualify as a "civil fine, penalty, or forfeiture" and, therefore, the statute of limitations does not apply to the disgorgement claims in the Complaint.

Section 2462 does not preclude disgorgement actions brought by the SEC where the claim seeks to "deprive[] one of wrongfully

obtained proceeds." Lorin, 869 F.Supp. at 1122. "[D]isgorgement
merely returns the wrongdoer to the status quo before any
wrongdoing had occurred." Id. "In contrast, fines, penalties,
and forfeitures alter the status quo before the unlawful activity
took place." Id. Penalties and forfeitures are meant to be
punitive.  They punish a wrongdoer for his or her violation.
Disgorgement, on the other hand, merely dispossesses the
wrongdoer of the profits earned from illegal conduct.  "SEC
actions seeking disgorgement differ slightly from 10b-5 actions
in that they do not attempt to redress a private injury, but
rather aim to separate the securities law violator from his or
her unlawfully obtained profits." Id.  Where "the sanction was
strictly remedial because it only required the defendant to
return overcharges to the plaintiff, and did not impose any
punishment," the sanction does not qualify as a fine or penalty
for the purposes of section 2462.  See Johnson v. SEC, 87 F.3d
484, 491 (D.C. Cir. 1996).  "Similarly, where the effect of the
SEC's action is to restore the *status quo ante*, such as through a
proceeding for restitution or disgorgement of ill-gotten profits,
§ 2462 will not apply.  Id.  (Emphasis in original.)

    Disgorgement, thus, is remedial in the sense that if there
were no profits earned as a result of the illegal conduct,
disgorgement would not be an available remedy.  On the other
hand, even where the illegal conduct produces no profits for a

civilly liable party, a fine or penalty could nonetheless be imposed, within the five-year limitations period, in order to punish the wrongdoer for his or her illicit behavior.  Since disgorgement is not included in the list of available remedies which are limited by section 2462, the Defendants' motion for partial summary judgment or to strike the disgorgement claims based on the applicability of section 2462 is hereby denied.

    **2.    The Parties' Agreement Tolled The Statute of Limitations**.

While section 2462 does not apply to the disgorgement claim, it does apply to the SEC's other claims.[3]  The Defendants claim that the Tolling Agreement was not completed until December 10, 2003, and the applicable statute of limitations expired, at the latest, on November 30, 2003.  Therefore, they claim, the Tolling Agreement could not prevent the expiration of the statute of limitations because the claims had already expired and could not be revived.  Thus, the statute of limitations remains an affirmative defense and the SEC's complaint should be dismissed.  Taking as true Defendants' assertion that the SEC's claims began to accrue on November 30, 1998, the Court will determine whether or not the Tolling Agreement entered into on December 10, 2003 tolled the applicable statute of limitations.

---

[3] The SEC seeks, in addition to disgorgement, a permanent injunction, an officer and director bar, and civil money penalties.

Because the statute of limitations is a defense, it can be waived.  United States v. Nat'l Steel Corp., 75 F.3d 1146, 1149 (7th Cir. 1996).  In Pacific Harbor Capital, Inc. v. Barnett Bank, N.A., 252 F.3d 1246, 1251 (11th Cir. 2001), the Eleventh Circuit found irrelevant a tolling agreement entered into by the parties after the expiration of the underlying statute of limitations.  The tolling agreement was entered into on December 9, 1996, but the claims expired more than two years earlier on October 1, 1994.  The agreement at issue in Pacific Harbor, however, is distinguishable.  It read, in relevant part, "if any applicable statute of limitations *had not expired by December 9, 1996*, it would be tolled until March 31, 1997."  Pacific Harbor, 252 F.3d at 1250 (emphasis added).  Thus, the parties only agreed to toll the statute for claims that had not expired as of December 9, 1996 - the date they entered into the agreement – and the underlying claims had in fact expired before December 9, 1996.  The agreement, by its own terms, did not apply to any claims that expired before December 9, 1996.  Here, DiBella and the SEC clearly agreed to toll the statute "as of October 24, 2003," and the SEC's claims had not expired as of that date.  Keefe Aff. Ex. 1.  Therefore, Pacific Harbor is distinguishable.

In Bachman v. Bear Stearns & Co., 57 F.Supp.2d 556, 561 (N.D. Ill. 1999), the parties entered into two tolling agreements.  Together, those agreements "tolled any applicable

11

statute of limitations from November 29, 1995" until May 1, 1996 or the termination of the tolling agreement, whichever came first.  Id.  However, the statute of limitations for the underlying Consumer Fraud claim expired on January 28, 1994, prior to the commencement of the tolling agreement.  Id.  Because the Consumer Fraud claim limitations period was no longer "applicable," the court found that the agreement did not revive the claim and it had expired.  Id.  There was no language in the parties' agreement which specified a tolling date prior to the expiration of the claim.  Rather, the agreement tolled any limitations period applicable to claims that were viable on November 29, 1995.

A more relevant example is Union Bank of Switzerland v. HS Equities, Inc., 457 F.Supp. 515 (S.D.N.Y. 1978).  There, the defendant claimed that the plaintiff's contract claim was barred by a six-year statute of limitations that began to run on January 12, 1968 and expired on January 12, 1974.  However, on February 26, 1975, over a year after the statute had expired, the parties executed a tolling agreement.  Id. at 520-21.  The tolling agreement read, "HS Equities Inc. hereby agrees that the six-year statute of limitations with respect to any claims which the Union Bank of Switzerland may have against it arising out of the account of Gerald Martin Zelmanowitz shall be extended to and including June 2, 1975."  Id.  (Emphasis added.)  The language of

that agreement differs from the agreements in <u>Pacific Harbor</u> and
<u>Bachman</u>.  <u>Pacific Harbor</u> and <u>Bachman</u> involved tolling agreements
that expressly stated a commencement date that occurred
subsequent to the expiration of the relevant claims.  The <u>UBS</u>
agreement tolls the statute of limitations "with respect to any
claims" that the plaintiff may have arising out of a specifically
identified account.  This language is very broad and contains
none of the limiting language present in the agreements in
<u>Pacific Harbor</u> or <u>Bachman</u>.  The <u>UBS</u> court found that the language
of the agreement was clear and unequivocal and, further, the
parties were represented by lawyers who negotiated and drafted
the agreement.  <u>Id.</u>  While the defendant regretted entering the
agreement, it could not avoid its force by asserting the
limitations statute after so clearly and obviously waiving the
right to do so, even though the waiver occurred a year after the
claim expired.  <u>Id.</u>

The same is true here.  DiBella and North Cove Ventures are
adequately represented by counsel who negotiated and, along with
DiBella and North Cove, signed the Tolling Agreement.  The
language of the agreement is clear.  The parties intended to toll
"any statute of limitations applicable to the proceedings or *any*
other action ... brought by or on behalf of the Commission ...
*arising out of* the [underlying] investigation <u>as</u> <u>of</u> <u>October 24,</u>
<u>2003</u>."  Keefe Aff. Ex. 1 (emphasis added).  As in <u>UBS</u>, the

13

Tolling Agreement contains broad language (e.g., "any statute of limitations"; "any other action") and applies that language to claims that arose from a specific investigation and existed "as of October 24, 2003." All parties agree that the SEC's claims had not expired as of October 24, 2003. The Tolling Agreement was completed and signed on December 10, 2003, but the record indicates that the Defendants and their counsel incorrectly signed the Tolling Agreement twice before the statute would have tolled on November 30, 2003 requiring the SEC to return the Tolling Agreement to the Defendants for proper signatures. Keefe Aff. Exs. 1-3. The substance of the agreement did not change. As the court in UBS v. HS Equities said, "the defendant[s] may have second thoughts about the wisdom of [their] agreement, but the Court can find no reason not to accept its terms as broadly as it was written." Union Bank of Switzerland, 457 F.Supp. at 521.

The intent of the parties is unmistakable and Defendants have waived their right to raise the statute of limitations defense. Because this Court finds that the Tolling Agreement is valid and binding, it is unnecessary to determine whether the claim would have expired on November 30, 2003, as Defendants claim, or March 31, 2004, as the SEC claims. The motion for summary judgment or to strike the SEC's claims because they are time barred is hereby denied.

B.    __The SEC Is Authorized To Seek Disgorgement__.

1.    __Equitable Relief Includes The Disgorgement Sought By
      The SEC In This Case.__

As the Second Circuit stated in SEC v. Commonwealth Chem.
Sec., 574 F.2d 90 (2d Cir. 1978), "the primary purpose of
disgorgement is not to compensate investors.  Unlike damages, it
is a method of forcing a defendant to give up the amount by which
he was unjustly enriched." Id., at 102.  "A historic equitable
remedy was the grant of restitution by which defendant is made to
disgorge ill-gotten gains . . . ." Id. at 95 (emphasis added).
"[W]hen restitution is sought in the form and in the situations
allowed in equity ... there is no right to jury trial." Id.
(Citations omitted.)  "Disgorgement of profits in an action
brought by the SEC to enjoin violations of the securities laws
appears to fit this description." Id.  In a similar SEC action,
the Second Circuit held that the function of disgorgement is to
undo unjust enrichment, not to compensate investors, and "the
trial court retains its traditional discretion to formulate a
disgorgement remedy." SEC v. AbsoluteFuture.com, 393 F.3d 94,
97-98 (2d Cir. 2004).  "[I]t is well settled that the amount of
disgorgement, as an equitable remedy, is determined by the amount
of profit realized by the defendant." Id. at 96, citing SEC v.
Patel, 61 F.3d 137, 139 (2d Cir. 1995).

These cases make clear that disgorgement of the kind sought

15

here by the SEC is an equitable remedy.  The SEC seeks to dispossess the Defendants of profits the SEC claims were received as a result of the alleged aiding and abetting of securities violations by Silvester and Thayer.  This is an equitable remedy, not an action for damages or money penalties.

   2.    **The SEC Possessed The Authority To Seek Disgorgement Prior To Sarbanes-Oxley.**

   Defendants claim that Congress did not grant the SEC the authority to seek disgorgement prior to the Sarbanes-Oxley Act of 2002, which added an explicit grant of authority to the SEC to "seek ... any equitable relief that may be appropriate ...."  15 U.S.C. § 78u(d)(5).  "Prior to the enactment of Sarbanes-Oxley in 2002, injured investors could only be compensated by funds obtained by the SEC from securities law violators through a disgorgement order.  That is, civil penalties were not available to compensate injured investors, as those funds were simply paid to the U.S. Treasury."  Zack Christensen, The Fair Funds For Investors Provision Of Sarbanes-Oxley: Is It Unfair To The Creditors Of A Bankrupt Debtor?, 2005 U. Ill. L. Rev. 339, 351 (2005).[4]  "[T]he SEC has sought and obtained compensation-related

_____

   [4] "However, disgorgement may only be paid to victims in cases 'where they can establish an equitable claim to the funds.' If the SEC determines that injured investors are not entitled to disgorgement funds, then it transmits those funds to the U.S. Treasury."  Christensen, supra, at 351 n.97.

disgorgement remedies in numerous cases over the years."  John

Patrick Kelsh, Section 304 Of The Sarbanes-Oxley Act of 2002: The

Case For A Personal Culpability Requirement, 59 Bus. Law. 1005,

1016 (2004).  "Disgorgement in these pre-Sarbanes-Oxley

proceedings has generally been limited to those instances in

which the defendant was in clear violation of the securities

laws, and the amount required to be disgorged has been limited to

that which is obviously traceable to the underlying wrongdoing."

Id.

    The Second Circuit acknowledged, in SEC v. Texas Gulf

Sulphur Co., 446 F.2d 1301 (2d Cir. 1971), that, "even though no

specific statutory authority exists" which granted the SEC the

power to authorize the appointment of receivers under the

Exchange Act, the courts of appeals have nonetheless upheld the

exercise of such equity power by the district courts.  Texas

Gulf, 446 F.2d at 1307.  There, the defendants sought to prevent

the court from ordering restitution by claiming that the

securities laws grant the SEC the authority only to seek

injunctive relief and other ancillary relief.[5]  Id.  The

defendants also claimed that the restitution sought was in

essence a penalty.  Id.  The Second Circuit denied the

_____

    [5] The defendants in Texas Gulf Sulphur conceded that the SEC
had the authority to seek "whatever ancillary relief is necessary
to enforce an injunction, such as the appointment of a receiver,"
despite the fact that "no specific statutory authority exists for
such an action."  Texas Gulf Sulphur, 446 F.2d at 1307.

defendants' request, recognizing that "in other contexts the Supreme Court has upheld the power of the Government without specific statutory authority to seek restitution, and has upheld the lower courts in granting restitution . . . ."  Id.  The Securities Exchange Act of 1934 should not be read to deprive the courts of their powers to grant appropriate remedies.  Id. at 1308.  The SEC is authorized to petition the court for remedial relief in addition to injunctive relief.  Id.  The court held that the restitution order was proper.  Id. at 1308.

Courts have upheld awards of disgorgement since, at least, 1971.[6]  In SEC v. Commonwealth Chem. Sec., the Second Circuit recognized the equitable nature of a disgorgement order and affirmed a lower court's order of disgorgement despite the defendant's claim that it deserved a jury trial on that issue.  Commonwealth Chem., 574 F.2d at 95.  The Commonwealth Chem. court agreed with the SEC that the federal courts had the power to grant disgorgement of ill-gotten profits, and that the remedy of disgorgement was equitable and therefore did not create a right in the defendants to a jury trial.  Id.  Other circuit courts have recognized the SEC's authority to obtain disgorgement orders as well.  See e.g. SEC v. Gen. Refractories Co., 400 F.Supp. 1248 (D.C. Cir. 1975).  The Gen. Refractories court held that "[i]t

---

[6] SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir. 1971).

has long been recognized that courts, pursuant to their general
equity powers, may order ancillary relief, including disgorgement
of monies or other benefits received, in SEC injunctive actions
brought pursuant to Section 21(e) of the Securities Exchange Act
of 1934 so as to prevent defendants from profiting from their
illegal conduct." Id. at 1260.

Congress has made various amendments to the securities laws,
including the Private Securities Litigation Reform Act (1995) and
the Sarbanes-Oxley Act (2002), but has declined these
opportunities to limit or eliminate the SEC's practice of seeking
and obtaining orders of disgorgement.  In fact, a review of the
text and legislative history of the various securities laws
supports the continued recognition by the courts of the SEC's
disgorgement authority.  For example, as the SEC identifies in
its brief, when enacting the Securities Law Enforcement Remedies
Act of 1990, Congress explicitly referred to SEC disgorgement
actions during its justification for granting the SEC authority
to buttress those disgorgement actions with civil money
penalties.  S. Rep. 101-337 (1990).[7]  Congress acknowledged the

---

[7] "In a number of enforcement cases, the SEC successfully
has urged courts to invoke their equitable powers to require that
law violators 'disgorge' the amounts by which they are unjustly
enriched.  A recent judicial decision clarified that the SEC may
obtain this relief when there are violations of disclosure and
filing requirements under the Federal securities laws.
Nonetheless, disgorgement requires only that the law violator
give up his unlawful gains and exacts no cost for his actions."
S. Rep. 101-337 (1990) (citation and footnote omitted).

SEC's authority to seek disgorgement and found that disgorgement alone, while a necessary and important tool, often provided an insufficient deterrent effect.[8]  Consequently, Congress authorized the SEC to seek civil money penalties in addition to its then-existing authority to seek disgorgement.  See also H. Rep. 101-616 (1990).

As part of the Private Securities Litigation Reform Act of 1995 (PSLRA), Congress declared that "[e]xcept as otherwise ordered by the court upon motion by the Commission . . . funds **disgorged** as the result of an action brought by the Commission in Federal court ... shall not be distributed as payment for attorneys' fees or expenses incurred by private parties seeking distribution of the disgorged funds."  Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67 § 103(b)(2) (codified at 15 U.S.C. § 78u(d)(4) (emphasis added)).  Again, Congress acknowledged the SEC's authority to seek disgorgement prior to the Sarbanes-Oxley Act.

_____

[8]"Increased deterrence. - The SEC's primary statutory remedy for securities law violations has been the civil injunction, together with such ancillary relief (*especially disgorgement of ill-gotten gains*) as the courts find appropriate in a particular case.  The Committee believes that injunctions against future violations, together with appropriate ancillary relief, *continue to have an important deterrent effect.  Nothing in the legislation should be viewed as diminishing the importance of injunctive action as a means of protecting the investing public against future violations, and this remedy should continue to be available to the SEC.*"  S. Rep. 101-337 (1990) , citing SEC v. Materia, 745 F. 2d 197 (2d Cir. 1984), cert. denied, 471 U.S. 1053 (1984), footnotes omitted.) (Emphasis added.)

In section 308(a) of the Sarbanes-Oxley Act, entitled "Civil Penalties Added to Disgorgement Funds for the Relief of Victims," Congress directs that, where the SEC obtains both disgorgement and civil money penalties in an action brought by the SEC under the securities laws, the amount of the civil penalty should, on motion or at the direction of the SEC, be added to the disgorgement fund to benefit victims of the underlying violation(s).  15 U.S.C. § 7246(a).  Also in section 308, Congress requires the SEC to conduct a study of SEC enforcement actions brought during the five years *preceding* the enactment of the Sarbanes-Oxley Act where civil penalties and/or disgorgement orders were sought to determine the effectiveness of those SEC actions.  15 U.S.C. § 7246(c) (emphasis added).  That section also requires the SEC to review and analyze other methods to improve the results of SEC claims for civil money penalties and disgorgement.  Id.

These statutory references evidence Congress' acknowledgment and encouragement of the SEC's long held authority to seek disgorgement in civil actions.  Congress is not only aware of the SEC's use of the disgorgement action as an enforcement tool, it seems to be quite supportive of the practice.  Further, rather than deprive the SEC, Congress expressly clarified the SEC's authority to seek equitable remedies, such as disgorgement, in

the Sarbanes-Oxley Act.[9]

Defendants' motion to strike based on their claim that the SEC was not authorized prior to the Sarbanes-Oxley Act to bring an action for disgorgement is hereby denied.

### 3. <u>Great-West</u> Does Not Preclude The SEC's Disgorgement Claim.

In <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204 (2002), the Court found that, while the petitioner described his claim as a claim for equitable relief, he was essentially asserting a damages claim for breach of contract, which was impermissible under the equitable remedy provisions of the relevant statute.  <u>Great-West</u>, 534 U.S. at 210.  Great-West, an insurance company, brought its own action in the District Court, after failing to remove the respondents' state action to federal court, claiming it was entitled to "other appropriate equitable relief" in the form of "specific performance" pursuant to § 502(a)(3) of the Employee Retirement Income Security Act of 1974 (ERISA).[10]  <u>Great-West</u>, 534 U.S. at 209.  Janette Knudson, the

---

[9] "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C. § 78u(d)(5).

[10] Section 502(a)(3) authorizes a civil action: "by a participant, beneficiary, or fiduciary ... (B) to obtain other appropriate equitable relief ...."  29 U.S.C. § 1132 (a)(3)(1994 ed.).

defendant, was injured in a car accident and required medical treatment resulting in expenses of $411,157.11, most of which was paid for by Great-West.  The underlying insurance contract between the parties provided a "'right to recover from the beneficiary any payment for benefits' paid by the Plan that the beneficiary is entitled to recover from a third party."  Id. at 207-08.  Knudson received an award in state court pursuant to a tort action against the Hyundai Motor Company and Great-West was seeking a reimbursement from the award.  Id. at 208-09.

Great-West filed an action under § 502(a)(3), claiming that the damages they sought qualified as "other appropriate equitable relief" because they were seeking specific performance of the aforementioned contract clause.  Id.  The Court disagreed with the petitioner and ruled that its claim was not in fact a claim for equitable relief, but rather a damages claim based on the contract.  The relief it sought was not equitable, and therefore § 502(a)(3) was not the appropriate means for redress. "[P]ersonal liability ... for a contractual obligation to pay money [is] relief that was not typically available in equity.  A claim for money due and owing under a contract is quintessentially an action at law."  Id. at 210.  Because the remedy sought in Great-West was not traditionally available in equity – rather, it was traditionally legal in nature – it was not permissible under the equity provisions of section 502(a)(3)

of ERISA.  <u>SEC v. Buntrock</u>, 2004 U.S. Dist. LEXIS 9495, at *7
(N.D. Ill. May 25, 2004).

Here, the SEC presents not a claim for damages, but rather a
typical and traditional claim for equitable relief in the form of
disgorgement.  "[D]isgorgement has historically been viewed as an
equitable remedy employed against those who profit by abusing
positions of trust.  In essence, it deprives a wrong-doer of ill-
gotten gains." <u>Buntrock</u>, 2004 U.S. Dist. LEXIS 9495, at *7-*8
(permitting SEC disgorgement claim despite defendant's claim that
<u>Great-West</u> precludes SEC from seeking disgorgement).
Disgorgement is equitable in nature and therefore <u>Great-West</u> does
not preclude the SEC's claim.

Defendants note that the United States Supreme Court has not
yet confirmed the authority of the SEC to seek disgorgement and
also that the Supreme Court's decision in <u>Central Bank</u> held that
plaintiffs, despite the precedent of civil suits for aiding and
abetting securities fraud, could not maintain such actions under
section 10(b) of the Exchange Act.  <u>See</u> Defs. Opp'n at 38.  It
would not be prudent to assume anything from the fact that the
Supreme Court has not confirmed the SEC's longtime use of the
disgorgement action to enforce the securities laws.  Using
similar logic, one could surmise that the Supreme Court approves
of such tactics by declining to eliminate the practice.  Further,
shortly after <u>Central Bank</u> was decided, Congress acted to re-

establish the SEC's ability to maintain an action for aiding and abetting the violation of the securities laws.  Despite a long history of court approval of SEC disgorgement actions, Congress has not yet responded to this long-standing judicial interpretation (as it did following Central Bank) to deprive the SEC of its ability to seek disgorgement.

> **a.   Defendants Are Not Absolved Merely Because DiBella's Fees Were Provided By Thayer and Not The Pension Fund.**

The fact that Defendants received the allegedly ill-gotten proceeds of the underlying securities violations from an alleged primary violator, and not the Pension Fund, does not diminish the SEC's authority to seek disgorgement.  "It is true that the primary purpose of disgorgement is to correct unjust enrichment, rather than to compensate investors." SEC v. AbsoluteFuture.com, 393 F.3d 94, 96 (2d Cir. 2004), citing SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978). "Based on this logic, [the Second Circuit] has upheld a district court's order of disgorgement of a defendant's profits resulting from transactions with other parties to the securities fraud, *even though such profits came at the expense of those other parties, rather than the investing public*." Id.  (Emphasis added.) Defendants argue that, since the funds sought by the SEC would not be transferred to a private plaintiff or injured investor, disgorgement is not appropriate in this context.  However, as

stated above, the primary goal of disgorgement is the dispossession of ill-gotten profits from a wrongdoer.  "It is immaterial that in a particular instance the enrichment came from another party to the scheme rather than from the public." Commonwealth Chem., 574 F.2d at 102.

Defendants' motion to strike the disgorgement claim based on the SEC's lack of authority to seek disgorgement is denied.

C.    **The SEC Has Alleged Facts Sufficient To Support The Disgorgement Claim**.

The Defendants claim that the SEC failed to establish a causal connection between the amount it seeks to disgorge and the underlying fraud.  The SEC attempts "to disgorge all monies received by [Defendants] as a result of the fraudulent conduct alleged" in the Complaint, including DiBella's $374,500 fee. Compl. Prayer For Relief ¶ II.

As previously stated, disgorgement orders are not means by which punishment is distributed.  Rather, "it is intended primarily to prevent unjust enrichment."  SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000).  "[T]he causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge."  Id.  "The SEC does not need to prove investor reliance, loss causation, or damages in an action under Section 10(b) of the Exchange Act, Rule 10b-5, or Section 17(a) of the

26

Securities Act." <u>SEC v. Credit Bancorp, Ltd.</u>, 195 F.Supp.2d 475, 490-91, 496 (S.D.N.Y. 2002) (citations omitted) (holding the SEC had authority to seek civil penalties and disgorgement while deferring the quantification of the civil penalty amount until after the amount of disgorgement is determined).

The Complaint details DiBella's participation in a fraudulent scheme by which the Pension Fund investment in Thayer IV was allegedly increased in order to provide a financial benefit to DiBella, Silvester's long time friend.  Compl. ¶ 1-6.  The financial benefit included the $374,500 fee that DiBella allegedly accepted without performing any work on the Thayer-Pension Fund deal.  The SEC seeks to disgorge the Defendants of that $374,500 consulting fee as it alleges those gains were ill-gotten.

The SEC has adequately pled amounts by which the Defendants were allegedly unjustly enriched and the necessary connection between those amounts and the amount sought by disgorgement.  Further, the parties may litigate this issue later if the Defendants are found liable.  <u>SEC v. Buntrock</u>, 2004 U.S. Dist. LEXIS 9495, at *8 (N.D. Ill. 2004).

   D.   **<u>The SEC Is Not Judicially Estopped From Maintaining The Underlying Aiding and Abetting Claims</u>**.

Judicial estoppel is appropriate where a party assumes a certain position in a legal proceeding, and then later assumes

the contrary position when it suits that party's changed interests.  New Hampshire v. Maine, 532 U.S. 742, 749 (2001). While there appears to be no concrete formula for determining the appropriateness of the doctrine's application, a court will typically apply judicial estoppel where (1) a party's later position is **clearly** inconsistent with its earlier position, (2) the party has succeeded in persuading a court to accept its earlier position and judicial acceptance of the later position would create the perception that either court was misled, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.  Id. at 750 (emphasis added).  The purpose is to protect against and prohibit parties from unfairly changing their position on the fly to suit their immediate and varying interests.

The Defendants claim that the SEC found, in In re Thayer Capital Partners, 2004 SEC LEXIS 1765, Securities Act Release No. 8457 (August 12, 2004) (the "Thayer Order"), that the Thayer respondents had not acted with scienter and therefore DiBella and North Cove Ventures cannot be found to have acted with scienter. Defendants make this claim based on their assertion that they can only be held liable to the "same extent" as the Thayer respondents.

The Thayer Order is an order entered by the SEC pursuant to

its investigation into the transaction at issue in this case (the
Thayer-Pension Fund deal) and subsequent settlement offers made
by the Thayer entities and accepted by the SEC.  However, the
Order contains a footnote indicating that its "findings" are
"made pursuant to Respondents' Offers of Settlement and are not
binding on any other person or entity in this or any other
proceeding."  Thayer Capital, 2004 SEC LEXIS 1765, at *2 n.1.
Further, there is nothing in the Thayer Order that indicates a
"finding" made by the SEC that the Thayer entities did not act
intentionally.  The Order merely states that "[a] finding of
*scienter* is not required under Section 206(2) of the Advisers
Act."  Thayer Capital, 2004 SEC LEXIS 1765, at *10 n.4 (emphasis
in original).  Defendants assume that, if the Thayer Respondents
had in fact acted intentionally, the SEC would have found them
liable under Section 206(1) and, therefore, the SEC "implicitly
found that Thayer did not act with *scienter*."  Defs. Reply at 17.
This argument is not convincing.

     The SEC at no time expressly found, or took the position, in
the Thayer Order that the Thayer Respondents did not act
intentionally.  Merely, the SEC held only that it was not
necessary to demonstrate scienter.  Moreover, the Thayer Order
contains no statements at all regarding DiBella's or North Cove's
scienter.  It is possible for DiBella to have intentionally aided
and abetted a negligent violation of section 206(2) by Thayer.

29

The SEC alleges that DiBella acted intentionally to aid and abet the primary violators and did not take a position in the Thayer Order regarding DiBella's or Thayer's scienter.  Therefore, Defendants' claim that the SEC is now advancing an argument that contradicts its position in the Thayer Order is inaccurate.  The SEC is not judicially estopped from claiming that DiBella and North Cove Ventures acted with scienter.  The motion for summary judgment as to the Second Claim based on judicial estoppel is denied.

## **Conclusion**

For the foregoing reasons, Defendants' motion for partial summary judgment and to strike [Doc. No. 18] is hereby DENIED.

SO ORDERED

_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this _____ day of January, 2006.