UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------X
SECURITIES AND EXCHANGE        :
COMMISSION                     :
                               :
            v.                 :        NO. 3:04cv1342 (EBB)
                               :
WILLIAM A. DIBELLA AND         :
NORTH COVE VENTURES, LLC.      :
                               :
------------------------------X

## <u>RULING ON DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL</u>

### <u>Background</u>

Plaintiff, the Securities and Exchange Commission ("SEC" or "Plaintiff"), brought this action against William DiBella and North Cove Ventures, LLC (jointly "Defendants") for aiding and abetting violations of § 10(b) of the Securities Exchange Act of 1934 (the "Act"), Rule 10b-5 thereunder, and §206(2) of the Investment Advisors Act of 1940 (the "Advisors Act"). At the close of evidence, Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The court reserved decision on Defendants' motion. On May 18, 2007, the jury returned a verdict in favor of Plaintiff on all counts. Specifically, the jury found that the SEC had proved by a preponderance of the evidence that former Connecticut State Treasurer Paul Silvester had knowingly or recklessly violated Section 10(b) of the Act and Rule 10b-5 thereunder, that Fred Malek, Thayer Capital and/or its affiliates had violated Section 206(2) of the Advisors Act and that Defendants had knowingly aided and abetted both violations.

Defendants have moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) or, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59(a). For the following reasons, the Court DENIES Defendants' Motion for Judgment as a Matter of Law [Doc. No. 110] and DENIES Defendants' Motion for a New Trial [Doc. No. 110].

### Summary of Facts

All parties are assumed to be familiar with the facts of this case. Thus this Court, reviewing the evidence in the light most favorable to the plaintiff, <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276 (2d Cir. 1998), will recount only those facts necessary for a determination of Defendants' post trial motions.

At trial, both parties stipulated to the following facts:

- On or about November 24, 1998, Paul Silvester, who was the Connecticut State Treasurer at the time, and Thayer Capital Partners, L.P., signed closing documents for the investment of $75 million by the Connecticut Retirement Funds and Trust Plans (the "Pension Fund") in Thayer Equity Partners IV, L.P. ("Thayer Equity" or "Thayer IV").

- On or about November 30, 1998, William DiBella and North Cove Ventures signed a written consultant and representation agreement with Thayer Partners IV relating to the investment by the Pension Fund in Thayer Equity.

- During the relevant period, North Cove Ventures was a limited liability company owned by William DiBella.

- The arrangement that William DiBella and North Cove Ventures executed with Thayer Equity provided for the payment of a $525,000 fee to North Cove Ventures pursuant to a schedule.

- In December 1998, Thayer Management Partners IV made a payment to William DiBella through North Cove Ventures in the amount of $25,000.

- After Paul Silvester left office, his successor as state treasurer, Denise Nappier, reduced the investment by the Pension Fund in Thayer Equity.

- In or about early 1999, after discussions and negotiations, Thayer Capital reduced the amount of the fee owed to William DiBella and North Cove Ventures from $525,000 to $374,500.

- In March 1999, Thayer Management Partners IV, LLC made a payment to William DiBella through North Cove Ventures in the amount of $349,500.

- The interests purchased by the Pension Fund in Thayer Equity constitute the "securities" as that term is defined by the Securities and Exchange Act of 1934.

- Paul Silvester, Fred Malek, the Thayer Entities and the Defendants used the mails or some means or instrumentality of interstate commerce in the course of discussing and/or executing the arrangement between the Defendants and the

Thayer Entities.

- Fred Malek, Thayer Capital Partners, L.P., Thayer Equity Partners IV, L.L.C., and Thayer Management Partners IV, L.L.C., were investment advisers as that term is defined by the Investment Adviser Act of 1940 to the Pension Fund.

7 Tr. 191-193 (Jury Charge)[1].

In addition, the jury could have reasonably found the following facts from the evidence presented. Silvester and DiBella had a personal friendship that pre-dated the events in this case. 3 Tr. 152-153; 5 Tr. 48-49. In or around the fall of 1997, DiBella introduced Silvester to Joseph Grano Jr., the president of Paine Webber, a stock brokerage firm. 5 Tr. 52. Pursuant to that meeting, Silvester ultimately invested $100 million of Pension Fund assets into a real estate trust with Paine Webber. 5 Tr. 55. Silvester and DiBella were both under the impression that DiBella would receive a "finders' fee" in exchange for his placement services in the Paine Webber deal. 5 Tr. 56. In November of 1998, they learned that DiBella would not receive a fee. 5. Tr. 189; 6 Tr. 18-19.

In or around August of 1998, Thayer Capital, with the help of Merrill Lynch, had begun soliciting the Connecticut Treasurer's office for an investment in Thayer IV. 2 Tr. 165-165; 5 Tr. 94.

---

[1]Citations to "Tr." are to the transcripts of the trial. The number preceding "Tr." indicates the volume number of the transcript.

After initially declining the proposed Thayer investment, the state's treasury investment officer, Michael MacDonald, recommended an investment of up to $25 million of limited partnership interest in Thayer IV. 1 Tr. 91. Defendants played no role in introducing the Thayer Capital investment opportunity to the State Pension Fund. 1 Tr. 73; 5 Tr. 88, 117.

Shortly thereafter, Silvester suggested to DiBella that he call Malek and negotiate a deal as a finder or placement agent for the Thayer IV- Pension Fund deal. 5 Tr. 65. DiBella and Malek later met and negotiated a compensation package worth 0.7% of the total Pension Fund investment in Thayer IV. 5 Tr. 99-100. Thereafter, DiBella asked Silvester to consider increasing the Pension Fund's investment in Thayer IV from $50 million to $75 million. 4 Tr. 6; 5 Tr. 70. After this request, Silvester increased the investment to $75 million. 5 Tr. 123.

## Discussion

### I. Legal Standard

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). In making its determination on such a motion, a court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable

inferences that the jury might have drawn in his favor from the evidence.'" <u>Tolbert v. Queens College</u>, 242 F.3d 58, 70 (2d Cir. 2001), <u>citing</u> <u>Smith v. Lightning Bolt Prods., Inc.</u>, 861 F.2d 363, 367 (2d Cir. 1998). A court evaluating such a motion "'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" <u>Id.</u> at 70, <u>quoting</u> <u>Smith</u>, 861 F.2d at 367. A jury verdict should be set aside only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." <u>Kosmynka v. Polaris Industries, Inc.</u>, 462 F.3d 74,79 (2d Cir. 2006) (internal citations omitted).

Rule 59 provides that "a new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States . . . " Fed.R.Civ.P. 59(a). Rule 59(a) "has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most

favorable to the verdict winner.'" <u>Manley v. Ambase Corp.</u>, 337 F.3d 237, 244-45 (2d Cir. 2003), <u>quoting</u> <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133-34 (2d Cir. 1998). However, a trial court should only exercise its discretion in granting a motion for a new trial when it is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>Smith</u>, 861 F.2d at 370. A motion for a new trial might be based on an argument that the trial was unfair to the moving party or that there was an error in the jury instructions. <u>Charts v. Nationwide Mutual Insurance Co.</u>, 397 F.Supp.2d 357, 374 (D.Conn.2005), <u>citing</u> <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251, 61 S.Ct. 189, 194 (1940). However, a court should only grant a Rule 59 motion if the jury's verdict was egregious. <u>Charts</u>, 397 F.Supp.2d at 374, <u>citing</u> <u>DLC Management Corp.</u>, 163 F.3d at 133.

Defendants move for judgment as a matter of law, or alternatively a new trial, on four main grounds. First, with respect to Rule 10b-5(a) and (c), they claim that the SEC failed to prove the existence of a fraudulent scheme, practice, or act because they did not establish that the Defendants did not provide "meaningful work" in exchange for their fee. Second, Defendants argue that the jury charge was flawed and deprived Defendants of a fair trial because it did not provide a standard or definition for what constituted "meaningful work". Third, with respect to Rule 10b-5(b), Defendants contend that Silvester had no duty to disclose

the fee agreement. Absent a duty to disclose, Defendants argue that as a matter of law, Silvester could not have violated Rule 10b-5(b), and Defendants cannot therefore be held liable as accomplices for Silvester's nondisclosure. Finally, Defendants claim that Plaintiff failed to prove a primary violation of Section 206(2) of the Investment Advisor's Act by Fred Malek and the Thayer Entities, and that even if such proof had been established, Defendants' could not, as a matter of law, aid and abet that violation.

## II. Rule 10b-5(a) and (c)

As a preliminary matter, the court addresses Defendants' argument that the SEC's "bare claim of 'no meaningful work' in a consulting agreement – essentially that the Defendants were perceived to have been paid too much for the work performed – is not a proper or sufficient evidentiary basis for its theory of a fraudulent or deceptive scheme, or of fraud or deceit." Defs.' Mem. in Supp. of Mot. at 42.

This statement mischaracterizes the Plaintiff's claim. In its complaint, Plaintiff alleges that "Silvester thus devised a fraudulent scheme in which he persuaded Thayer and its affiliates, through Malek, to hire DiBella in connection with the Pension Fund's investment in Thayer IV. As part of the scheme, Silvester and DiBella *did not expect* that DiBella would perform any work in exchange for substantial fees paid to him by Thayer, *and Silvester*

*increased the size of the Pension Fund's investment in Thayer IV to increase the size of DiBella's fee.*" Compl. at ¶ 33 (emphasis added). In the jury charge, the jury was instructed that Plaintiff charged Silvester with "engaging in a fraudulent scheme, pursuant to which he arranged, so as to pay for unrelated work, political favors, and future goodwill, for the Defendants to receive substantial fees despite providing no meaningful work in connection with Silvester's investment of Pension Fund money with Thayer Capital." 7 Tr. 210-211 (Jury Charge).

The allegations above do not turn on whether Defendants' provided meaningful work. In other words, the SEC does not claim that the scheme was fraudulent because Defendants' did not provide meaningful work in return for the fees they received. Instead, the SEC alleges that Silvester's investment in Thayer IV was predicated on a desire to receive political favors and repay DiBella for unrelated work, and that Silvester's primary motivation in increasing the Pension Fund's investment in Thayer IV was to increase DiBella's fee. These allegations, if proved, would be unlawful regardless of whether Defendants' actually provided meaningful work.[2]

Moreover, Defendants' reliance on <u>United States v. D'Amato</u>, 39

---

[2]For example, from evidence adduced at the hearing, the jury learned that Silvester received prison time for arranging for two other individuals to receive unwarranted finder's fees in other investments by the Pension Fund, even though they provided actual services after receiving the fees. 3 Tr. 124, 138; 4 Tr. 38-41.

F.3d 1249 (2d Cir. 1994) is misplaced.  In D'Amato, the United States claimed that the defendant defrauded Unisys Corporation by structuring his billings to conceal the fact that his actual services involved lobbying his brother, a United States Senator, and by contracting to provide written reports that he never intended to provide.  Id. at 1252.  The Second Circuit vacated the defendant's conviction for mail fraud, stating that the statute "did not criminalize the charging of an allegedly excessive fee" and that "the Government offered no evidence that access to [the defendant's brother] was not worth the fees paid." Id. at 1261-62. The instant case is distinguishable for at least two reasons. First, in D'Amato, Unisys had agreed to the fee, had itself requested that the defendant disguise his billings, and had never expected to receive written reports from the defendant.  Id. at 1259.  Thus, the Second Circuit reasoned that there could not be fraud where the supposed victim of the fraud acquiesced in the conduct and was not deceived.  See id. at 1262.  Here, the putative victim (the Pension Fund investors) did not acquiesce.  Second, in D'Amato, the United States premised one of its claims on whether or not the defendant's services were worth the fee paid.  Id. at 1261. Here, as previously noted, the SEC's claim does not turn on whether Defendants' received an excessive fee relative to the services they did or did not provide.

Turning to the evidence presented in this case, the court

concludes that viewed in the light most favorable to the Plaintiff and with "deference to all credibility determinations and reasonable inferences of the jury," Galdieri-Ambrosini, 136 F.3d at 289, the evidence was sufficient to permit a reasonable jury to find that Defendants had knowingly aided and abetted in violations of Rule 10b-5(a) and (c).

First, the evidence adduced at trial was sufficient for the jury to reasonably conclude that Silvester had intentionally, or with reckless disregard for the truth, engaged in a fraudulent scheme, act or practice in violation of 10b-5(a) and (c). Silvester testified that the primary purpose for including Defendants in the Thayer IV deal was to make up for the fact that they did not receive a finders' fee on the Paine Webber deal. 3 Tr. 212; 4 Tr. 193. He testified that he asked DiBella to "call up Fred Malek and work out a deal where [DiBella] was going to be a finder," even though he knew that Merrill Lynch had already found and placed the deal with Thayer IV. 3 Tr. 207-208. Silvester also admitted that he increased the Pension Fund's investment in Thayer IV so that Defendants could receive a higher fee, 4 Tr. 28, 212, 282, that he never intended for Defendants to do any substantive work and that "it was clear to William DiBella that he didn't have any work to do in that investment process." 4 Tr. 33-34. In addition, Silvester testified that he told DiBella that if the federal authorities learned of DiBella's involvement in the Thayer

11

IV deal, Silvester believed that "the feds would be all over him."
4 Tr. 42-43. Finally, Silvester testified that he plead guilty to
criminal charges in connection with the Pension Fund's investment
in Thayer IV:

"Q:  Did you plead guilty to committing a crime in connection with
     an investment that you made in Thayer Capital November 1998,
     sir?

A:   Yes, I did.

Q:   And to what, if any, extent did you plead guilty to the fact
     that you asked Thayer to pay someone a finder fee in exchange
     for doing business with the state pension fund, sir?

A:   I pled guilty because of that.

Q:   The someone was Mr. DiBella, right?

A:   Yes."

3 Tr. 152.

Second, the evidence adduced at trial was sufficient for the
jury to reasonably conclude that Defendants were liable for aiding
and abetting Silvester's violations of Rule 10b-5(a) and (c).

To prove aiding and abetting liability, the SEC had to
establish that Defendants' conduct was knowing and provided
substantial assistance to Silvester's violations. See IIT, an
International Investment Trust v. Cornfeld, 619 F.2d 909, 922 (2d
Cir. 1980). Both DiBella and Silvester testified that Silvester
expressly told DiBella to call Malek and "work out a deal with him

as a finder." 5 Tr. 65; 4 Tr. 209. DiBella testified that he was not the finder, 5 Tr. 117, that it was his understanding that Silvester put him in the Thayer IV deal to make up for the Paine Webber deal, 5 Tr. 122, and that he had a general awareness that Silvester's conduct was improper:

"Q:   . . . I'm asking you if you had any concern whatsoever or gave any thought to the fact that Mr. Silvester was making this investment decision with respect to Thayer, apparently on the basis of a desire to repay you for the Paine Webber deal?

A:   I did have some concerns, yes.

Q:   And what was that concern?

A:   I was concerned that the way it was going down, but I also felt that I wasn't breaking the law.

Q:   Did you think Mr. Silvester was breaking the law?

A:   I didn't know . . .

. . .

Q:   And it would have been inappropriate for Mr. Silvester to make decisions based on friendship, is that right?

A:   Again, it was his decision, it wasn't mine.

Q:   But I'm asking you whether or not you knew at the time that it was inappropriate for Mr. Silvester to make decisions –

A:   It probably was.

Q:   And you knew it was inappropriate for him to make decisions based upon political considerations; isn't that right?

A:   Well, I'm not sure that he was the first treasurer to ever make political considerations relative to a decision. But yes, you're right, he wasn't supposed to do that.

Q:   And you also knew that it would have been inappropriate for him to make decisions based upon attempting to repay favors; is that right?

A:   Yes."

5 Tr. 127

In addition, a jury could reasonably conclude from DiBella's testimony that his conduct provided substantial assistance to Silvester's violations. For example, the jury could consider the following testimony from DiBella regarding the increase in the Pension Fund's investment in Thayer IV:

"Q:  At the point you recommended to Mr. Sylvester that he increase the investment to $75 million, you had no understanding about whether or not that would be an appropriate investment amount, I mean investments for the state – investment level for the State of Connecticut to make?

A:   From Mr. Sylvester's perspective?

Q:   From anyone's perspective.

A:   No, I didn't.

Q:   And again, as you said, you had not been hired to increase this investment?

A:   No, I had not.

. . .

Q:   You did not know whether Thayer even wanted to increase the size of this investment, did you?

A:   No.

. . .

Q:   And when you proposed that Sylvester increase the investment to $75 million, you did so knowing that the increased investment would mean a greater fee from Thayer to you, isn't that right?

A:   It would be one of the results."

5 Tr. 78-81.

As it turned out, the jury heard testimony that Malek and the Thayer Entities were ambivalent about raising the investment to $75 million:

"Q:   What did you think about the idea of increasing the investment to $75 million?

A:   I was relatively indifferent to raising it to 75. I definitely wanted Connecticut to be an investor, because I wanted to form a lasting relationship with an important pension fund. But we were – at this point, I was fairly confident we were over subscribed and would have to cut others back in order to accommodate that."

1 Tr. 205-205.

**B. The Jury Charge**

Defendants argue that the lack of a definition for what constituted "no meaningful work" was fundamental error and rendered the jury charge constitutionally deficient for vagueness, thus depriving Defendants of a fair trial. Defs.' Mem. in Supp. of Mot. at 37-38. The court disagrees.

First, the jury charge was not fundamental error. "To qualify as a fundamental error a jury charge must have deprived the jury of adequate legal guidance to reach a rational decision." De Falco v. Bernas, 244 F.3d 286, 312 n. 16 (2d Cir. 2001) (internal quotation marks omitted). "A jury charge is erroneous if it misleads the jury as to the correct legal standard, or if it does not adequately inform the jury of the law." Hathaway v. Coughlin, 99 F.3d 550, 552-53 (2d Cir. 1996). In evaluating a jury charge, the court looks to the charge as a whole, and will reverse the jury verdict "only if [it is] persuaded 'that the error was prejudicial or the charge was highly confusing.'" Patrolmen's Benevolent Ass'n. of City of New York v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002), quoting Time Inc. V. Petersen Publ'g Co., 173 F.3d 113, 119 (2d Cir. 1999).

Here, the SEC's allegation that Defendants' provided "no meaningful work" was a factual one designed to add further support to their claim that the fee arrangement was a fraudulent scheme. The phrase was not an element of the SEC's cause of action.

Moreover, the jury did not need a definition of what constituted "meaningful work" in order to understand and correctly apply the law. The phrase required no definition because it was "neither outside common understanding nor so technical or ambiguous as to require specific definition." See United States v. Johnpoll, 739 F.2d 702, 712 (2d Cir. 1984) (determining that a jury instruction that failed to define the word "recently" was not erroneous).[3]

Second, Defendants' claim that the jury instructions were void for vagueness is without merit. The void-for-vagueness doctrine is principally employed in the interpretation and application of criminal statutes and civil provisions prohibiting future conduct. Boutilier v. Immigration and Naturalization Service, 363 F.2d 488, 495 (2d Cir. 1966). The doctrine requires that provisions define prohibited conduct "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Betancourt v. Bloomberg, 448 F.3d 547, 552 (2d Cir. 2006); see also United States v. Harris, 347 U.S. 612, 617 (1954) ("The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be

---

[3]In addition, although Defendants objected to the court's jury instructions at trial, "a defendant who challenges a jury instruction must establish (1) that he requested an instruction that "accurately represented the law in every respect" and (2) that the instruction actually given was, viewed as a whole, prejudicial to his rights." U.S. v. Yousef, 327 F.3d 56, 130 (2d Cir. 2003), quoting U.S. v. Pujana-Mena, 949 F.2d 24, 27 (2d Cir. 1991). Defendants did not furnish a request in this case.

proscribed.").

Here, Defendants invoke the void-for-vagueness doctrine not to challenge the language of a criminal statute or a provision imposing a civil sanction, but instead to challenge jury instructions.

First, the court notes that none of the cases cited by Defendants are applicable. All but one of the cases cited narrowly considered the issue of whether state laws that gave unfettered jury discretion in awarding punitive damages were constitutional.[4]

The one case cited by Defendants not involving state punitive damages schemes is unavailing. In United States v. Leahy, 445 F.3d 634 (3d Cir. 2006), the defendant in a bank fraud case argued that the trial judge had improperly instructed the jury as to the elements of bank fraud and what level of *mens rea* the jury needed to find the defendant possessed in order to convict him. Id. at 642, 644. Unlike the phrase "no meaningful work" in the present case, the lack of a definition of the requisite *mens rea* and what

_____

[4]In Browing-Ferris Indus. v. Kelco Disposal, 492 U.S. 257, 109 S.Ct. 2909 (1989), the Court held that the Excessive Fines Clause of the Eighth Amendment did not apply to punitive damages awards between private parties, and specifically noted that the issue of whether an excessive punitive damage award would violate the Due Process Clause was not before the Court. In Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23, 111 S.Ct. 1032, 1046 (1991) the Court rejected the void for vagueness argument. In State Farm Mat. Auto Ins. Co. v. Campell, 538 U.S. 408, 123 S.Ct. 1513 (2003), the Court found that an award of punitive damages was excessive and violated the Due Process Clause, but did not address any void for vagueness challenge. In Clark v. Chrysler Corp, 436 F.3d 594 (6th Cir. 2006), the court held a punitive damages award to be unconstitutionally excessive, but limited its discussion to vague jury instructions to juries imposing punitive damages.

the elements of bank fraud were would clearly deprive a jury of the adequate legal guidance it needed to reach a rational decision.

Moreover, Justice O'Connor's dissent in <u>Pacific Mut. Life Ins. Co. v. Haslip</u>, 499 U.S. 1, 111 S.Ct. 1032 (1991), upon which the Defendants place heavy reliance, does not lend support to their case. In <u>Haslip</u>, Justice O'Connor stated that the void-for-vagueness doctrine applied to "*laws* that vest standardless discretion in a jury to fix a penalty", and argued that a state scheme that instructed a jury that it did not have to award punitive damages "unless this jury *feels* that you should do so," was a textbook example. 499 U.S. at 44, 111 S.Ct. at 1057 (emphasis added). As Justice O'Connor noted, "Instead of reminding the jury that its decision must rest on a factual or legal predicate, the instruction suggests that the jury may do whatever it 'feels' like . . . As I read the instruction, it as much permits a determination based upon the toss of a coin or the color of the defendant's skin as upon a reasoned analysis of the offensive conduct." <u>Id.</u> at 44-45, 111 S. Ct. at 1057. The jury charge in the present case, which provided clear legal definitions of the elements of the statutes and instructed the jury that "it would be a violation of your sworn duty to base any finding of fact on anything other than the evidence presented to you in this case," 7 Tr. 189-90 (Jury Charge), cannot be analogized to the jury charge in <u>Haslip</u>.

## C. Rule 10b-5(b)

Rule 10b-5(b) states that "it shall be unlawful for any person . . . to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading".  To be actionable, an omission must involve information that the defendant had a duty to disclose.  See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).

Defendants argue that as a matter of law, Silvester had no duty to disclose the fee arrangement, and Defendants cannot, therefore, be held liable as accomplices for Silvester's nondisclosure.[5] The court disagrees.

The Connecticut State treasurer is a fiduciary to the Pension Fund. See Conn. Gen. Stat. § 3-13h(b); see also Conn. Gen. Stat. § 45a-541(a) ("a trustee who invests and manages trust assets owes a duty to the beneficiaries of the trust to comply with the prudent investor rule").  As such, the treasurer has a duty to disclose under federal securities law.  In Chiarella v. United States, the

---

[5]Defendants also argue that Silvester could not have violated Rule 10b-5(b) because if he did have a duty to disclose, it was only to himself, as "the sole person responsible for the Pension Fund." Defs.' Mem. In Supp. Of Mot. at 30. Defendants claim that because Silvester was already aware of the fee arrangement, he satisfied his duty to disclose.  However, Defendants' assertion that Silvester was the sole person responsible for the Pension Fund is contradicted by Gen Stat. Conn. 3-13b as it existed in 1999, which made clear that the Investment Advisory Council ("IAC") had the statutory authority to review all investments recommended or made by the Treasurer, and that the Governor could direct the Treasurer to change any investment when, in the opinion of the IAC, it would be "for the best interest of the state."

Supreme Court stated that a "duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relationship of trust and confidence between them.'" Chiarella, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114 (1980). In Chiarella, the petitioner was a printer whose printing company had been hired to print corporate takeover bids. The petitioner deduced the names of the target companies, bought stock in them, and sold the shares immediately after the takeover attempts were made public, at a profit. In vacating the petitioner's conviction under Section 10b of the Securities Act, the Court specifically noted the lack of a fiduciary or other relationship between the petitioner and the sellers:

> "No duty [to disclose] could arise from petitioner's relationship with the sellers . . . he was not their agent, he was not their *fiduciary*, he was not a person in whom the sellers had placed their trust and confidence. He was, in fact, a complete stranger . . .. Formulation of such a broad duty . . . departs radically from the established doctrine that duty arises from a specific relationship between two parties, see n.9 *supra* . . ." Id. at 232-33, 100 S.Ct. at 1117.

In addition, the treasurer's obligation to disclose under Section 10(b) is consistent with the Supreme Court's "rich tradition of interpreting the antifraud provisions of federal securities laws expansively," Grandon v. Merrill Lynch & Co., Inc., 147 F.3d 184, 192 (2d. Cir. 1997); see also Affiliated Ute Citizens

21

<u>v. United States</u>, 405 U.S. 128, 151, 92 S.Ct. 1456 (1972) (noting that Section 10(b) and Rule 10b-5 "are broad, and ... obviously meant to be inclusive"); <u>United States v. Russo</u>, 74 F.3d 1383, 1390 (2d Cir. 1996) ("[T]he Supreme Court has interpreted Section 10(b) and Rule 10b-5 expansively in accordance with congressional intent to minimize fraud in securities trading."); <u>Chris-Craft Industries, Inc. v. Piper Aircraft Corp.</u>, 480 F.2d 341, 363 (2d Cir. 1973) ("a major congressional policy behind the securities laws in general, and the antifraud provisions in particular, is the protection of investors who rely on the completeness and accuracy of information made available to them . . .Those with greater access to information, or having a special relationship to investors making use of the information, often may have an affirmative duty of disclosure,") <u>citing</u> 1 Bromberg, Securities Law: Rule 10b-5, § 7.1, at 14 (1971).

Defendants claim that "numerous decisions recognize that 10(b) and Rule 10b-5 do not impose an independent fiduciary duty to disclose." Defs.' Reply Mem. in Supp. of Mot. at 9. However, Defendants erroneously conflate "independent fiduciary duty" with "duty to disclose". Defendants are correct that unlike Section 206(2), which imposed a statutory fiduciary relationship between investment advisors and clients who fell under the Investment Advisors Act, Section 10b did not create independent fiduciary relationships where none existed. <u>See</u> <u>Norman v. Salomon Smith</u>

22

<u>Barney Inc.</u>, 350 F. Supp. 2d 382, 391-92 (S.D.N.Y. 2004). However, the issue here is not whether Section 10b independently imposes a fiduciary relationship where there was none. The Connecticut State treasurer is clearly a fiduciary to the Pension Fund, notwithstanding the Securities Act. <u>See</u> Conn. Gen. Stat. § 3-13h(b); <u>see</u> <u>also</u> Conn. Gen. Stat. § 45a-541(a). Thus, the issue is whether Section 10b can impose *on a fiduciary* a duty to disclose. Under <u>Chiarella</u>, the answer is yes.[6]

To prove that Silvester violated Rule 10b-5(b), the SEC had to show that his alleged omission was material and was made with the intent to defraud or with reckless disregard for the truth. <u>See</u> <u>Rolf v. Blyth, Eastman Dillon & Co.</u>, 570 F.2d 38, 46 (2d Cir. 1978).

A fact is considered material if there is a "substantial likelihood that the disclosure of the omitted fact would be viewed by a reasonable investor as having significantly altered the 'total mix' of information available." <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983 (1988) (internal quotations omitted). Here, DiBella testified that, at the point he recommended the increased investment to Silvester, he had no understanding of whether $75 million would be an appropriate

_____

[6] Defendants also argue that Silvester had no statutory duty under Connecticut State law, as it existed in 1999, to disclose information about investments by the Pension Fund. However, because Silvester had a duty to disclose under federal securities law, the court does not address this argument.

investment amount for the Pension Fund to make, 5 Tr. 78, yet Silvester testified that his decision to increase the Pension Fund's investment in Thayer IV was done at DiBella's urging. 4 Tr. 32. A jury could reasonably conclude that this information would be viewed material by a reasonable investor.

The SEC also put forth sufficient evidence for the jury to conclude that Silvester acted with intent to defraud or with reckless disregard for the truth. Silvester testified that he knew that he had a fiduciary duty to the Pension Fund, and that the decision to move from a $50 million to $75 million investment in Thayer IV so that Defendants could receive a higher fee did not comport with this duty. 4 Tr. 28-29. He also testified that his duty was to act solely for the best interests of the Fund, and that he breached this duty regardless of whether DiBella provided any work in return for the fee:

"Q:  You testified earlier, sir, that your activity in connection with securing Mr. DiBella a fee for Thayer investment did not comport with your fiduciary duties; is that right, sir?

A:  I believe so.

Q:  How?

A:  Because there's a fiduciary concept which suggests – more than suggests – it states that all of your investment decisions have to be solely for the benefit of the Fund and put everything else out of your mind and put what's in the best

24

interests of the Fund. So any political considerations or good

acts or anything else, counterpart to doing a business

transaction, that you engage in cannot have any impact on your

decision-making.

Q:   So, in terms of what you did wrong, what, if anything,

difference does it make as to whether or not Mr. DiBella

actually provided real services to Thayer in connection with

how you involved him in that transaction, sir?

A:   Again, this would be a conflict of my fiduciary duty."

4 Tr. 40-41.

Finally, the jury could also have reasonably determined that

Defendants knowingly aided and abetted Silvester's failure to

disclose. DiBella testified that he knew that Silvester was a

fiduciary to the Fund:

"Q:  But did you understand that he was a fiduciary of the fund?

A:   I don't know if I would other than – yes, a fiduciary, I

guess, was the word that was used constantly relative to the

treasurer.

Q:   And you also understood that he had an obligation to make

investment decisions that were only in the best interests of

the fund, didn't you?

A:   Basically that that was his responsibility, to make

investments there, yes.

Q:   But to make those investments only in the best interest of the

fund, isn't that right?

A:    I would assume that's what he would do, yes."

5 Tr. 31–32.

In addition, the jury could reasonably have found Defendants
to have substantially assisted Silvester's violation of Rule 10b-
5(b).  A defendant substantially assists a primary violation of
Rule 10b-5 if the defendant's conduct is a substantial causal
factor in the perpetration of the underlying fraud. See Rolf v.
Blyth, Eastman, Dillon & Co., Inc., 570 F.2d 38, 48 (2d Cir.1978).
Here, as previously noted, the jury was presented with evidence
that Silvester increased the Fund's investment in Thayer IV at
Defendants' request, 4 Tr. 6, 28, 212; 5 Tr. 70, and that
Defendants did not know whether Thayer wanted the increase or
whether the investment level was appropriate. 5 Tr. 78–81.

**D. Section 206(2)**

Defendants' final argument is that Plaintiff failed to prove
a primary violation of Section 206(2) by Fred Malek and the Thayer
Entities, and that even if such proof had been established,
Defendants' could not, as a matter of law, aid and abet a violation
of Section 206(2).

Section 206(2) of the Advisor's Act provides, in pertinent
part:
> "It shall be unlawful for any investment
> advisor, by use of the mails or any means or
> instrumentality of interstate commerce,
> directly or indirectly . . . (2) to engage in
> any transaction, practice, or course of

> business which operates as fraud or deceit
> upon any client or prospective client."

The Act "reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship,' as well as a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested." SEC v. Captial Gains Research Bureau, Inc., 375 U.S. 180, 191-92, 84 S.Ct. 275, 282-83 (1963) (internal citations omitted). Proving a violation of Section 206(2) "simply requires proof of negligence by the primary violator." SEC v. PIMCO Advisors Fund Management LLC, 341 F. Supp. 454, 470 (S.D.N.Y. 2004). At trial, the parties stipulated that Fred Malek and the Thayer Entities were investment advisors and that they used the mails or some means or instrumentality of interstate commerce in the course of discussing and/or executing the arrangement between themselves and the Defendants.

Viewing the evidence in the light most favorable to the Plaintiff, a reasonable jury could have concluded that Malek and the Thayer Entities were engaging in a transaction, practice, or course of business which operated as a fraud or deceit upon the Pension Fund.

The parties stipulated that Malek and the Thayer Entities entered into an arrangement where they agreed to pay Defendants

$525,000, a figure that was later reduced (and paid in full) to $374,500. 7 Tr. 193 (Jury Charge). Malek testified that he had no personal knowledge of any services DiBella provided as a placement agent in connection with the Thayer IV- Pension Fund deal, and that he had no personal knowledge of any services DiBella provided after the investment was made. 1 Tr. 216-217. Although the letter memorializing the agreement between Defendants and Thayer IV stated that DiBella would represent Thayer Capital in assisting to raise capital for Thayer IV, Ex. 18; 1 Tr. 208, Malek testified that DiBella did not do this. 1 Tr. 208. Moreover, Malek testified that he did not think he needed DiBella to help him raise capital. 1 Tr. 200. Malek stated that he hired DiBella to help Thayer with the document process and to introduce him to the new Treasurer, but testified that he knew that DiBella did not provide these services. 1 Tr. 196, 199-200, 216-218. Apart from Silvester, Malek did not disclose his arrangement with DiBella to anybody in the Connecticut State Treasurer's office. 1 Tr. 223.

The jury could also have reasonably concluded that Malek and the Thayer Entities acted at least negligently. From the above evidence, the jury could have found that the circumstances surrounding the fee arrangement with DiBella would lead an ordinarily prudent person to not enter into the agreement, or to disclose it, in order to avoid injury to the Pension Fund. In addition, Malek testified that he was aware of his fiduciary duty:

Q:    And what was your role within the entity TC Equity Partners
      IV?

A:    I don't know if I was chairman or just one of the general
      partners . . .

Q:    Did you have a leadership role?

A:    Oh, absolutely . . .

. . .

Q:    And in connection with the solicitation of the investment
      fund, you understood that Thayer and its affiliates had an
      obligation not to misrepresent facts, isn't that right?

A:    Absolutely.

Q:    And you also understood that they had an obligation not to
      omit material facts; isn't that right?

A:    Correct.

1 Tr. 215-216.

    Defendants argue that the SEC failed to prove a Section 206(2)
violation by Malek and the Thayer Entities because Silvester was
aware of the fee arrangement with DiBella.  They claim that  Malek
and Thayer fulfilled their fiduciary duty to the Pension Fund
because they disclosed the fee agreement to Silvester, who "spoke
and acted for the Pension Fund."  Defs.' Mem. in Supp. of Mot. at
33.

    First, Defendants inadequately state the violation at issue,
which was not just a failure to disclose.  Rather, as the jury

charge instructed, Malek and Thayer Entities could be liable under Section 206(2) if the jury found that they "failed to exercise the ordinary or reasonable care or competence in entering into the arrangement with the Defendants *and/or* failing to disclose material information about that arrangement to the Connecticut Pension Fund." 7 Tr. 225 (Jury Charge) (emphasis added).

More importantly, Section 206 "establishes a statutory fiduciary duty for investment advisors to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." SEC v. Moran, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996); see also SEC v. Capital Gains Research Bureau, 375 U.S. 180, 194, 84 S.Ct. 275, 284 (1963). In the present case, even assuming *arguendo* that Silvester was the sole representative of the Pension Fund, reasonable care would dictate that Malek and the Thayer Entities disclose the fee arrangement to another individual in the Treasurer's office not involved in the formation of the agreement in order to avoid injury to the Pension Fund.

Defendants claim that even if the SEC proved a primary violation of Section 206(2), Defendants cannot, as a matter of law, be held liable as accomplices because "a party cannot aid and abet a negligent omission." Defs.' Mem. in Supp. of Mot. at 34. The

court disagrees[7].

Courts have found defendants liable for aiding and abetting principal violations of Section 206(2). <u>See</u> <u>SEC v. Washington Inv. Neqwork</u>, 475 F.3d 392, 406-07 (D.C. Cir. 2007) [affirming finding that appellants aided and abetted Section 206(2) violations, and holding that "to be liable as an aider and abettor under sections 203(f), 206(1), *and 206(2)*, the SEC must prove knowledge of wrongdoing, or a general awareness . . ." (emphasis added)]; <u>SEC v. Batterman</u>, No. 00 Civ. 4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30, 2002) (finding that defendant aided and abetted Section 206(2) violations); <u>see also</u> <u>SEC v. DiBella</u>, 409 F. Supp. 2d 122, 136 (D. Conn. 2006) ("it is possible for DiBella to have intentionally aided and abetted a negligent violation of Section 206(2) by Thayer").

Moreover, Defendants' use of <u>United States v. Hitachi America Ltd.</u>, 172 F.2d 1319 (Fed Cir. 1999) is unavailing. At issue in <u>Hitachi</u> was whether a party could *negligently* aid a negligent violation of the customs statute. In finding no authority in support of this proposition, the Federal Circuit reiterated the well settled rule that some showing of knowledge or intent on the part of the aider or abettor is required to prove accomplice

---

[7]The court also notes again that this inadequately states the primary violation at issue, which was not just a failure to disclose, but also a failure to exercise the ordinary or reasonable care of competence in entering into the financial arrangement with the Defendants. <u>See</u> 7 Tr. 225 (Jury Charge).

liability. <u>Id.</u> at 1337. Here, the court's jury instructions clearly stated that the SEC needed to demonstrate that the Defendants acted knowingly in order to establish aiding and abetting liability. 7 Tr. 228 (Jury Charge).

The evidence the SEC put forth, as recounted above, was sufficient for a reasonable jury to conclude that Defendants knowingly provided substantial assistance to Malek's and the Thayer Entities' violations of Section 206(2). As previously noted, Defendants entered into a financial agreement with Thayer IV on November 18, 1999 providing that "[Defendants] will represent Thayer Capital in assisting to raise capital for Thayer Equity Investors IV, LP" Ex. 18; 1 Tr. 208; 5 Tr. 100. However, DiBella testified that subsequent to that agreement, he did not assist in raising any capital. 5 Tr. 102. Nonetheless, Defendants accepted payment of $374,500 from Thayer IV. 5 Tr. 151-152; 7 Tr. 192-193 (Stipulations).

## **CONCLUSION**

Having reviewed the evidence presented to the jury, in the light most favorable to the Plaintiff, the Court finds that there was sufficient evidence to support the jury's verdict. Thus, Defendants' Motion for Judgment as a Matter of Law [Doc. No. 110] is DENIED. Further, because Defendants have failed to prove that the jury reached an erroneous result, or show any miscarriage of justice in their trial, this Court declines to exercise its

discretion under Fed. R. Civ. P. 59(a) to grant a new trial. Accordingly, Defendants' Motion for a New Trial [Doc. No. 110] is also DENIED.


SO ORDERED


_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE


Dated at New Haven, Connecticut this _____ day of October, 2007.