overly broad disgorgement request fails to consider the practice in the Second Circuit and the significant taxes paid by Mr. DiBella on the fee over two years.

Taxes paid by a defendant are properly considered as a setoff or deduction where a defendant can establish the amount of taxes paid. *See SEC v. World Gambling Corp.*, 555 F. Supp. 930, 943-35 (S.D.N.Y. 1983) (permitting offset for transfer taxes; no offset for corporate income taxes because those were unknown and hypothetical), *aff'd*, 742 F.2d 1440 (2d Cir.), *cert. denied*, 465 U.S. 1112 (1984); *SEC v. Zwick*, 2007 WL 831812, *24 (S.D.N.Y. Mar. 16, 2007) (offset for taxes considered and denied where defendant did not provide tax returns or other evidence to verify the claimed offset); *SEC v. Svoboda*, 409 F. Supp.2d 331, 344 (S.D.N.Y. 2006) (considering and denying setoff for capital gains taxes because defendant failed to identify basis for the deduction and even if court could reduce by taxes paid defendant did not specify amount of taxes paid).

Here, Mr. DiBella should be credited with a deduction for taxes paid as explained below. He has demonstrated the taxes paid with the concurrent filing of his accountant's Affidavit, which details his preparation and review of Mr. DiBella's federal and Connecticut state tax returns for the years 1998 and 1999 relevant to the Consulting Fee. *See* Affidavit of Steven W. Caldwell of Blum Shapiro & Company, P.C. (annexed as Exhibit E). Based on Mr. DiBella's tax returns for those years (and his trial testimony that he paid taxes on the fee, May 16 Tr.) this evidence establishes the taxes paid by Mr. DiBella on the fee as follows.

- **1998**: Of the $25,000 of the Consulting Fee paid by Mr. Malek and Thayer Capital to Mr. DiBella in 1998, Mr. DiBella paid $4,200 in federal and $675 in Connecticut state taxes on that sum. Exhibit E at ¶ 7.

25

- **1999**: Of the $349,500 of the Consulting Fee paid by Mr. Malek and Thayer Capital to Mr. DiBella in 1999, Mr. DiBella paid $88,854 in federal and $12,205 in Connecticut state taxes on that sum. *Id.* at ¶ 8.

From the entire Consulting Fee of $374,500, therefore, Mr. DiBella paid taxes of $105,934 on the fee and can only be said to have actually received $268,566. *Id.* at ¶ 9. That is the sum that Defendants actually realized. The SEC does not take these significant taxes into account in computing disgorgement, thus inflating its disgorgement amount. Contrary to the SEC's position, Defendants simply did not have the use and benefit of the gross amount of the Consulting Fee. The Court must take these taxes into account in awarding disgorgement, if any.

### 2. The Lack Of Disgorgement Against Primary Actors Indicates Little Or No Disgorgement Is Warranted Against Secondary Actor Mr. DiBella.

The Defendants do not mean to belabor the point, but again here, the total lack of any disgorgement imposed by the SEC against Mr. Malek is instructive. The SEC seeks the maximum disgorgement and interest amounts from Mr. DiBella, indisputably a secondary actor. Yet, it did not seek any disgorgement of the many tens of millions in fees that Mr. Malek and Thayer Capital, the primary actors, received from their role in the conduct. Mr. Malek was charged with, and consented to findings of, much more serious willful violations (violations of § 17(a)(2) of the Securities Act and § 206(2) of the Investment Advisers Act) than Mr. DiBella. Exhibit B. Mr. Malek was further found after the trial to have committed primary violations. Exhibit C. Mr. Malek was a primary actor and wrongdoer. Thus, he was determined by the SEC to be more culpable in his conduct. *See* Exhibits B & C.

Mr. Malek and his firms, Thayer Capital entities, reaped many tens of millions of dollars in management and related fees from the placement and subsequent administration of the Connecticut Pension Fund investment and other investments with them in November 1998.

Among other fees, Thayer Capital entities were paid a staggering "management fee" of $16 million per year, by investors such as the Pension Fund, semi-annually in advance, which was not based on success. Exh. 1 at 10; May 10 Tr. at 145-147. According to Mr. Malek's trial testimony, his firms are still receiving $800,000 per year in 2007. *Id.* at 148. A large portion of those fees were derived from and paid by Connecticut's investment with Thayer Capital. Those fees dwarf the gross sum ($374,500) that Mr. DiBella was paid by Mr. Malek and Thayer Capital under the Consulting Agreement (he was not paid by the Pension Fund but by Mr. Malek). However, no disgorgement at all was imposed against him and his firms. *See* Exhibit B. Silvester, too, was ordered to repay only $10,500 in the SEC's case against him. *See* Consent Judgment at 1 & 4 (ordering repayment), Exhibit A.

### 3. The Likelihood Of Future Fraud Does Not Exist And The Disgorgement Sought Is Impermissibly Punitive.

Additionally, as set forth above, there is no genuine threat of "future fraud" by the Defendants that might warrant such severe and punitive disgorgement. This case is Mr. DiBella's first and only violation and North Cove Ventures is defunct. Courts have denied disgorgement to the SEC or ordered less disgorgement when the disgorgement was, as here, not appropriate for the circumstances, or was effectively punitive or other remedies were available or imposed. *E.g., Todd*, 2007 U.S. Dist. LEXIS 38985, at *53-54 (SEC request for disgorgement of officers' salaries denied as "punitive"); *Cohen*, 2007 U.S. Dist. LEXIS 28934 at *64-65 (disgorgement not ordered where SEC failed to show that defendant benefited from violation through salary, bonuses, or stock sales); *Jones*, 476 F. Supp. 2d 374 (dismissing SEC claim for disgorgement because SEC could not provide guidance for same); *SEC v. Platinum Investment Corp.*, 2006 U.S. Dist. LEXIS 67460 (S.D.N.Y. 2006) (joint and several disgorgement denied

against lesser involved "small player" in conduct where he was reckless participant but had less culpability).

For instance, in *McCaskey*, 2002 WL 850001, the court denied the SEC's request for disgorgement in much more severe circumstances. In *McCaskey*, the defendant was charged with violating § 10(b)/Rule 10b-5 of the Exchange Act and § 17(a) of the Securities Act by manipulating the market for public stock, thus artificially affecting the price. *Id.* The defendant pled guilty to criminal violations of § 10(b)/Rule 10b-5 in a parallel criminal case, a plea which had binding estoppel effect on him in the SEC's civil case. *Id.* In denying the SEC's request for disgorgement, the court noted that the primary purpose of disgorgement is neither punitive nor compensatory, but to prevent the defendant's unjust enrichment. *Id.* at *7-10 (although court acknowledged defendant had profited from the trades, also found his losses should be considered as offsets and that any disgorgement would thus be punitive). As in other cases, disgorgement should be denied or substantially reduced to no more than the amount of the penalty paid by Mr. Malek.

### 4. The Court Should Deny The Request For Prejudgment Interest Or, Alternatively, If Prejudgment Interest Is Awarded, It Should Be Greatly Reduced.

The Court should deny the SEC's request for an award of prejudgment interest. The SEC seeks a huge amount of interest ($286,055) that is almost 25% of the total monetary relief sought ($1,035,055). The interest sought is almost equal to (it is 76% of) the amount of disgorgement (of $374,500). It also seeks five years of interest (about $157,929) before this action was even filed; that amounts to 55% of the total interest sought. *See* SEC's Prejudgment Interest Report. Simply put, the interest sought is excessive and should be denied.

Alternatively, if any prejudgment interest is imposed, it should be awarded only in a greatly reduced amount by both the time period over which the interest is computed and the interest rate because: (1) the prejudgment interest sought by the SEC was computed based on its overstated disgorgement and any interest should instead be based on the lower amount of $268,566 actually received by Mr. DiBella, (2) imposing the rate of interest and prejudgment interest for almost nine years is excessive since (i) five (5) years of that interest resulted from the passage of time before the SEC's filing of this action and/or the SEC's delay in waiting five years to file, and (ii) fourteen (14) months of additional time passed because of reasons unrelated to the Defendants' conduct as explained below.

As with disgorgement, an award of prejudgment interest is not mandatory, as the SEC concedes. SEC Mem. at 8. The Court has broad discretion to decide whether it is appropriate to order prejudgment interest. *McCaskey*, 2002 WL 850001, at *12 n.17. In "determining the appropriateness of an interest award, courts rely on the level of the defendant's culpability" and other factors including considerations of fairness and the equities, the need to compensate a wronged party, if any, and other general factors and principles found relevant in the particular circumstances of the case. *Id.* (denying SEC's request for disgorgement and prejudgment interest); SEC Mem. at 8.

Based on these considerations, prejudgment interest should be denied. In particular, considering the factors such as fairness and the relative equities, the remote and secondary nature of the aiding and abetting violations, and the fact that they are Mr. DiBella's first and only offense of any kind, an award of prejudgment interest would not be equitable. Further, although the SEC takes the position that the Pension Fund was wronged by Mr. DiBella, he was not paid by the Pension Fund or the State of Connecticut. Prejudgment interest is also especially

inappropriate here because the imposition of nine years of interest at the rate permitted by law[18] would effectively <u>double</u> the amount of the requested disgorgement to almost $700,000 and be impermissibly punitive against Mr. DiBella.

If the Court were to consider an award of prejudgment interest, the interest should be substantially reduced, by both the time period over which the interest is computed and the rate of interest, for the following reasons: *First*, the prejudgment interest sought by the SEC was computed based on its overstated disgorgement (of $374,500) and any interest should instead be based on the lower amount (of $268,566) actually realized by Mr. DiBella after taxes. For this reason, the amount of interest sought is too high. The Court should instead calculate interest only on any reduced disgorgement amount, not the gross amount sought by the SEC.

*Second*, imposing prejudgment interest for almost nine years is excessive since five years of that interest resulted from the passage of time before the filing of this action and/or the SEC's delay in waiting five years to file, and for other time unrelated to the Defendants' conduct. The SEC did not bring this action for some five years after the relevant events (1999-2004). It is improper for the SEC to make the strategic decision to wait five years to bring a case knowing that it likely has a claim, and then to include all of that time when it seeks prejudgment interest. Those five years of time come to $157,929 of interest, or about 55% of the interest it now seeks. *See* SEC's Prejudgment Interest Report. Allowing the SEC to sit silent for five years and then to collect interest thereon would amount to a substantial windfall and would encourage delay in bringing cases and excessive demands for prejudgment interest.

Attorney Hugh Keefe, prior counsel to Mr. DiBella, testified at trial that that United States Attorney's Office advised him very late, probably in 2004, that no criminal charges would

---

[18] The IRS underpayment rate, which is the Federal short term rate plus a maximum of three percent, is the usual interest rate. *See* 26 U.S.C. § 6621.

be brought against Mr. DiBella. The relevant conduct occurred in late 1998 and early 1999. As the Court knows, though, the SEC had been investigating events surrounding Paul Silvester since at least 2000 when it subpoenaed Mr. DiBella. *See* Memoranda of Law in Support and Opposition to Motion in Limine to Preclude Evidence of Invocation of Fifth Amendment Privilege, Docket Entry Nos. 65 & 70. Mr. DiBella appeared before the SEC in August, 2000. *Id.* The SEC then waited to file this civil case four years later on August 12, 2004. *See* Docket Entry No. 1. Perhaps that long delay was because of tactical reasons relative to the criminal cases and investigations of Silvester and/or the government's use of Silvester as a witness in other cases.[19] Be that as it may, in fairness and equity, the five years of time should not be charged against the Defendants especially when it amounts to such a significant part of the total interest sought.

At a minimum, the protracted length of time between the conduct and the filing of the action (five years), and the conduct in 1998/1999 and the verdict in 2007 (ten years, including the length of time of this litigation itself, from 2004 through at least 2007) should be taken into account in reducing the rate of interest. Separately, Defendants respectfully remind the Court of the 14-month period of time, from September 30, 2004 through November 29, 2005, that their motion to dismiss was pending due to an injury and medical condition suffered by the Court. *See* Docket Entry Nos. 15-20 & 45 (indicating filing dates of motion and ruling thereon).

Excluding the five years of time pre-suit and the 14 months of time that the motion to dismiss was pending, reduces the time period of interest by more than six years (74 months or 18 ½ quarters). Computed on a quarterly basis, and using the rates employed by the SEC, reduces the interest to $32,927.07, even using the SEC's inflated and inappropriate disgorgement amount

---

[19] This is another reason for a hearing, namely, so that the long delay in bringing this case due to the ramifications that would have on the criminal proceedings involving Silvester can be fully developed for the Court.

(starting with one quarter at the outset of the case and then the quarter after the motion to dismiss was decided, January 2006, through the filing of the SEC's within Motion, in October, 2007). *See* Defendants' Prejudgment Interest Schedule (annexed as Exhibit F). As stated, the Court should employ a still lower rate of interest, at a rate in its discretion, for the time period of January 2006 through October, 2007 when the merits of the case were pending.

For these reasons, courts frequently reduce or order a different, lower rate of prejudgment interest when it is imposed at all. *See, e.g., SEC v. United Energy Partners, Inc.*, 2003 U.S. Dist. LEXIS 1247 (N.D. Tex. Jan. 29, 2003), *aff'd*, 88 Fed. Appx. 744 (5th Cir. 2004) (interest reduced to one-half IRS underpayment rate); *SEC v. Monarch Funding Corp.*, 1996 U.S. Dist. LEXIS 14559 (S.D.N.Y. Oct. 3, 1996), *vacated on other grounds*, 192 F.3d 295 (2d Cir. 1999) (prejudgment interest amount awarded was 1/3 sum sought by SEC; interest awarded only for period from 1984 through 1988, but interest for the period thereafter denied because of protracted proceedings); *SEC v. Rubin*, 1993 U.S. Dist. LEXIS 13301 (S.D.N.Y. Sept. 24, 1993) (interest imposed as to one defendant but no interest imposed as to second defendant who was lesser involved, did not share in profits and unable to pay).

## IV.

### THE THIRD TIER CIVIL PENALTY SOUGHT BY THE SEC IS NOT WARRANTED OR JUSTIFIED. IF A PENALTY IS IMPOSED, IT SHOULD BE IN A SIGNIFICANTLY LESSER AMOUNT AT THE FIRST TIER LEVEL.

Finally, the SEC also requests unwarranted and inordinate relief by seeking the maximum third tier civil penalty under the law. In its zeal to punish Mr. DiBella, the SEC seeks another $374,500 penalty on top of the $660,555 in disgorgement and prejudgment interest it seeks. The penalty sought is the same amount that the SEC seeks to have disgorged. SEC Mem. at 12. That is unwarranted, excessive and punitive.

Any disgorgement would alone be a sufficient remedy given Mr. DiBella's role in the case, the equities and the circumstances. *See SEC v. Mellert*, 2006 WL 927743, *1-2 (N.D. Calif. 2006) (denying additional civil penalty beyond disgorgement even where defendant was prosecuted criminally for same conduct; conduct was isolated and one-time, there was no concealment and defendant was not employed in the securities industry). "Even considerations of general deterrence do not mandate the maximum penalty in every case. If they did, there would be no reason for Congress to have granted courts discretion to impose a lesser penalty." *Rubin*, 1993 U.S. Dist. LEXIS 13301, *17. An additional, civil penalty should not be awarded here for all the reasons stated herein. *See id.*

However, should the Court conclude that some additional penalty is appropriate, it should be imposed only at the significantly lower first tier level of at most $5,000 for a natural person such as Mr. DiBella because: (1) of all the reasons set forth above in Sections I, II and III, (2) his secondary aiding and abetting violations do not warrant nearly such a severe penalty because his conduct did not involve fraud or deceit or disregard of a regulatory requirement, or substantial losses and (3) the amount of the penalty sought is inappropriate and excessive in light of the substantially less severe penalty imposed against the primary actors. The SEC's unsubstantiated arguments should be rejected and no penalty imposed or, at most, the Court should rule in favor of a more reasoned and appropriate penalty of at most $5,000. *See* 15 U.S.C. §§ 78u(d)(3)(B)(i); 80b-9(e)(2)(A).

A.   <u>**The High Standard And Justification For A Third Tier Penalty Is Not Met**</u>

While the SEC is authorized to seek a civil penalty under the relevant securities laws, 15 U.S.C. §§ 78u(d)(3), 80b-9(e), here too, it is a required element that the SEC make the "proper showing" that the person has violated the relevant securities provision triggering such relief. *Id.*

Importantly, under these statutes, "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. §§ 78u(d)(3)(B)(i), 80b-9(e)(2)(A). Thus, the penalties are not to be considered in the abstract, but based on the relevant circumstances before the Court. *See id.* Based on those circumstances here, at most, a first tier penalty of up to $5,000 is all that may be appropriate. *See* 15 U.S.C. §§ 78u(d)(3)(B)(i); 80b-9(e)(2)(A).

The SEC seeks a huge civil penalty pursuant to the third tier of each statute. 15 U.S.C. §§ 78u(d)(3)(B)(iii), 80b-9(e)(2)(C). For a third tier penalty – essentially the maximum possible penalty – the amount of the penalty cannot exceed $100,000 for a natural person, or the gross amount of the gain to the defendant from the violation but <u>only if</u> the violation involved fraud, deceit, manipulation or deliberate or reckless disregard "of a regulatory requirement" and the violation resulted in substantial losses or created significant risk of substantial losses to other persons. *Id.*

A civil penalty is not mandatory, as the SEC concedes. SEC Mem. at 11; *Rubin*, 1993 U.S. Dist. LEXIS 13301, *17. In determining whether and to what extent any penalty might be imposed, courts consider many of the same factors as are relevant with other remedies including: the egregiousness or not of the violations, the defendant's degree of scienter or not, any repeat nature of the violations, whether the violations created substantial losses or risk thereof, and whether the penalty should be reduced due to other remedies or financial condition. *Snyder*, 2006 U.S. Dist. LEXIS, 81830, at *34-35. The Court has discretion to impose a penalty, if any, that suits the offense. *SEC v. Moran*, 944 F.Supp. 286, 296 (S.D.N.Y. 1996) (imposing lesser penalty than sought by the SEC).

### B. The Conduct Did Not Involve Fraud Or Deceit By Mr. DiBella, Or His Disregard Of A Regulatory Requirement, Or Involve Substantial Losses To Other Persons, And Thus Does Not Warrant A Third Tier Penalty

In addition to all of the reasons already set forth above in Sections I, II and III with respect to his conduct and the inappropriateness or degree of other remedies, a third tier penalty should be denied in this case of secondary, aiding and abetting violations.

#### 1. The Conduct Did Not Involve Fraud Or Deceit, Or Disregard Of A Regulatory Requirement By Mr. DiBella.

Mr. DiBella did not himself violate any of the relevant securities provision triggering such relief. 15 U.S.C. §§ 78u(d)(3), 80b-9(e). Nor was he even charged with those direct violations. Silvester and Mr. Malek and Thayer Capital were so charged. Mr. DiBella's offense was aiding and abetting. *See* Complaint. The SEC's request for a civil penalty should be denied on this ground alone.

Even so, Mr. DiBella's own violations also did not involve intentional fraud or deceit or manipulation by him. He was a secondary actor and aider and abetter who was remote from the primary actors and violations, and he did not have a fiduciary duty or duty to disclose himself that may have been violated with respect to any investors. *DiBella*, 2005 WL 3215899, at *10. His conduct occurred long ago and was isolated, with no prior or subsequent violations. By the SEC's own charges, his conduct was, at most, limited to a handful of acts over three months. *See* Complaint. Moreover, as the SEC acknowledges (SEC Mem. at 4 n.2), the business entity used in the conduct, North Cove Ventures, is now defunct.

The SEC also argues that Mr. DiBella's conduct involved a disregard of a regulatory requirement (SEC Mem. at 12), but that is not so and the SEC never identifies what regulatory requirement it is referring to. *Id.* There was no regulatory requirement on the part of Mr.

DiBella, a third party consultant not in a fiduciary position to the Pension Fund or the State of Connecticut. Mr. DiBella did not have any duty to disclose or he would have been charged as a primary violator. And, as set forth above, the Court did not address the duty of disclosure in its ruling on the post-trial motions. Accordingly, the regulatory requirement cannot provide a basis for a civil penalty. With respect to his violations as to Mr. Malek and Thayer Capital, Mr. DiBella's conduct was found to have aided and abetted merely a negligent violation of the securities laws, not an intentional violation. *See* Exhibit C, Verdict Form (Questions 4-6). To the extent, if any, there can be secondary assistance of negligence, such conduct is not deserving of a civil penalty.[20]

As with the other relief sought by the SEC, the remedy imposed by the SEC on Mr. Malek and Thayer Capital is informative here as well. Even though he and his firms were charged with more serious primary securities violations, and found liable (twice) and earned tens of millions in fees including some directly from the investment with the Connecticut Pension Fund, the SEC imposed a penalty on Mr. Malek of $100,000.[21] Exhibit B at 6. That penalty is substantially lower than, and less than one-third (1/3), the penalty that the SEC now seeks to have ordered against Mr. DiBella. No explanation is offered by the SEC, however, for this enormous disparity in the amount of the penalties given the difference in the respective level of violations, conduct and culpability.

---

[20] Although the Court did not address this issue in its ruling on the post-trial motions, Defendants maintain that one cannot be held liable for aiding and abetting negligence. *See, e.g.*, Defendants' Reply Memorandum of Law in Further Support of Their Renewed Motion for Judgment as a Matter of Law or for a New Trial at 12-13 (citing authorities).

[21] The Thayer Capital firms were required to pay $150,000. Exhibit B at 6.

## 2. The Conduct Did Not Result In Substantial Losses For Other Persons.

Throughout its Motion, the SEC also tries to argue that the Pension Fund's investment with Thayer Capital has not performed well and to attribute that asserted performance to Mr. DiBella. *E.g.*, SEC Mem. at 9-10 & 12. However, he was not hired by the State of Connecticut or the Pension Fund and was not paid by them and did not make any investment decisions relative to the Pension Fund including the initial decision of whether to invest at all.

The Pension Fund did not pay Mr. DiBella any of his fee; Mr. Malek and Thayer Capital did. May 9 Tr. at 125-126. As stated above, further, the Pension Fund's investment would have happened with or without Mr. DiBella's involvement. He was not the driving force behind Connecticut's investment with Thayer Capital. Even so, the investment was about an average investment for the Pension Fund and for Thayer Capital. The SEC's own witness, Michael MacDonald, the Investment Officer – Alternative Investments in the Treasurer's Office in 1998, testified at trial that some of the Pension Fund's investments were better and some were worse performing than Thayer Capital investment. May 9 Tr. at 115. As Mr. Malek explained at trial, Connecticut's investment with his firm was a good one and performed very well initially. May 10 Tr. at 148-149. It suffered a downturn in about 2002 with the rest of the stock market when the Internet and tech bubble burst. *Id.* at 149 & 151-152. It has since recovered a good deal and recently returned five times on one investment. *Id.* at 150 & 151-152.

Further, undisputed trial testimony by Mr. Malek proved that it is not possible to know until the end of the 10-year term of the investment, here the end of 2008, whether the investment was ultimately a profitable one. May 10 Tr. at 91. Therefore, it is not possible to say conclusively, as the SEC does, that there were any losses by the Pension Fund, even apart from the fact that Mr. DiBella did not have any role in making the decision to invest. Mr. Malek and

his firm were also very reputable and well known. *Id.* at 114. As Mr. Malek testified, his firm was in the top quartile (25%) of private equity firm rankings and had a successful track record of previous investments and investment funds, with a 29% compounded rate of return on all of its investment funds. May 10 Tr. at 83-84. Thus, although Mr. DiBella did not decide whether to make the investment and was not paid by Connecticut or the Pension Fund, the investment with Thayer Capital was a legitimate investment with a highly qualified investment adviser.[22]

### 3. Case Law Indicates That No Civil Penalty Or At Most A Modest First Tier Penalty Is Warranted.

The SEC seeks an out of proportion civil penalty that is not supported under the law. Conspicuously, it does not cite any similar case. As telling, it does not cite even one case where such severe penalty was imposed against any aiding and abetting violator in similar circumstances. The SEC also does not cite one case where the combination of remedies on the order of the magnitude sought here was imposed based on similar circumstances and aiding and abetting violations. In the cases it does cite, to the extent they could be considered relevant, the offenses were far different and more severe.[23] They thus establish that a substantially lesser penalty, if any, is warranted against Mr. DiBella.

Numerous cases involving more serious primary violations, or aiding and abetting violations, have warranted either no civil penalty, or a substantially lower first tier penalty than that sought by the SEC here. While every case ultimately rests on its own facts and circumstances, these cases indicate that a civil penalty, if any, against Mr. DiBella as a secondary

---

[22] While the SEC states that all three tiers of penalties could conceivably apply here and result in a penalty of the gross monetary gain that Mr. DiBella received under the Consulting Agreement (SEC Mem. at 11 n.3), that argument is illusory. The most appropriate penalty, if any is imposed, would be under the first tier, especially when taken together with any disgorgement that may be considered and imposed by the Court.

[23] *SEC v. Haligiannis*, 470 F.Supp.2d 373 (S.D.N.Y. 2007) is but one such case. There, the court granted remedies of more than $30 million against the defendants because of intentional securities fraud involving a Ponzi scheme and criminal proceedings where a large number of investors were defrauded and the main defendant was a fugitive from justice who fled with the profits of his crime. Nothing approaching that sort of conduct is involved in this case.

actor should be at the first tier level of $5,000, and certainly much less than the penalty imposed against Mr. Malek. *See, e.g., Synder*, 2006 U.S. Dist. LEXIS, 81830, at *34-35 (denying civil penalty against individual defendant due to lack of egregiousness, isolated nature of conduct and other factors, even where jury found that he was at least severely reckless); *SEC v. Inorganic Recycling Corp.*, 2002 U.S. Dist. LEXIS 15817 (S.D.N.Y. 2002) (denying civil penalty against one individual defendant who was lesser beneficiary of scheme); *Todd*, 2007 U.S. Dist. LEXIS 38985, at *55-56 (court refused SEC's request for third tier civil penalties and granted first tier penalties of $10,500 and $16,500 against individual defendants for aiding and abetting violations); *SEC v. Opulentica, LLC*, 479 F. Supp.2d 319, 331-332 (S.D.N.Y. 2007) (imposing first tier penalty of $5,000 against lesser involved defendant who among other things was a smaller beneficiary of the scheme); *Moran*, 944 F.Supp. at 296-297 (imposing lesser penalty of $5,000 against individual defendant than that sought by the SEC, under first tier, despite four statutory and two rules violations due in part to other remedies imposed and the nature of the violations); *Slocum, Gordon & Co.*, 334 F. Supp.2d at 186-187 (denying SEC request for third tier penalty based on deliberate conduct and substantial losses; imposing first tier penalty of $3,000). The Court should deny a penalty or award a minimum amount under the first tier.

V.

**ANY FAIR FUNDS PLAN SHOULD BE DENIED.**

Although the SEC does not include a specific request for the establishment of a Fair Funds plan in its Motion, it suggests in its supporting Memorandum and Proposed Judgment that it will place any monetary recovery from Mr. DiBella into a common fund. SEC Mem. at 10 & 12 n.5; Proposed Judgment at 4-5.[24]

---

[24] A Fair Funds reserve and plan first requires an imposition of disgorgement before any civil penalty can be added to it. 15 U.S.C. § 7246(a). Under the relevant securities laws, a civil penalty must generally be paid directly to the

Plainly, this case does not involve massive, intentional accounting frauds as was the case at WorldCom (with a settlement fund of $750 million) or Qwest (with a fund of $250 million) such that investor restitution funds were appropriate there.[25] Even assuming some disgorgement is directed so as to trigger the Fair Funds provision, the distribution process of these funds by the SEC is notoriously slow and cumbersome. Allocation would also be extremely difficult here given the many thousands of members and beneficiaries of the Pension Fund over the span of the 10-year investment with Thayer Capital. Even were there to be a modest sized fund, the size of distributions to individual beneficiaries would likely be small and not justify such a fund. In addition, the huge administrative cost, process and expense of a plan with an administrator or distribution agent would not be justified in a case of this type and size.

The SEC has previously stated, as a matter of policy, that it would not request the creation of Fair Funds where the modest value of the gains and the number of potential claimants would result in high administrative costs and minimal distributions.[26] The SEC also specifically acknowledges as much in its Rules of Practice. *See* Rule 1102(b), SEC Rules of Practice. Therefore, the SEC's request for a plan in this case is inappropriate. It is still more indication that the SEC is simply out to penalize Mr. DiBella as much as possible by seeking outsized disgorgement and penalties no matter what the circumstances. Any request by the SEC for establishment of a Fair Funds plan should be denied.

---

United States Treasury unless the Court orders disgorgement and the establishment of a Fair Funds. *See* 15 U.S.C. §§ 78u(d)(3)(C)(i); 80b-9(e)(3)(A); 15 U.S.C. § 7246(a).

[25] *SEC v. WorldCom, Inc.*, 273 F.Supp.2d 431 (S.D.N.Y. 2003) and *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 76 (2d Cir. 2006) (settlement of $750 million plus token $1 in disgorgement); *SEC v. Qwest Communications, Int'l, Inc.*, Litig. Release No. 18936, 2004 SEC LEXIS 2403 (Oct. 21, 2004) (settlement fund of $250 in penalties and $1 in nominal disgorgement).

[26] *See* Adoption of Amendments to Rules of Practice and Delegations of Authority of the Commission, Exchange Act Release No. 49412 (Section B. Fair Funds and Disgorgement), 2004 SEC LEXIS 592 (Mar. 12, 2004).

# CONCLUSION

For all of these reasons, the Court should (1) deny the permanent injunction, (2) deny the imposition of a permanent officer and director bar, (3) deny disgorgement and prejudgment interest or, at most, impose substantially lesser disgorgement and interest, (4) deny the civil penalty or, at most, impose a modest civil penalty at the first tier level of at most $5,000, (5) deny any request by the SEC for a Fair Funds plan or common fund distribution, and (6) grant such other and further relief as it deems just and proper.

Respectfully submitted,

DEFENDANTS
William A. DiBella and
North Cove Ventures, LLC

By: *[signature]*

James A. Wade (CT00086)
William J. Kelleher III (CT22140)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299
E-mail:   jwade@rc.com
          wkelleher@rc.com

## CERTIFICATION

This is to certify that a copy of the foregoing was filed with the Court and served via electronic mail and first-class mail, postage prepaid on this 30th day of November, 2007 to the following:

Luke T. Cadigan, Esq.
Daniel O'Connor, Esq.
Sr. Trial Counsel
U.S. Securities and Exchange Commission
33 Arch Street, 23rd floor
Boston, MA 02110

John B. Hughes, Esq.
Assistant United States Attorney
U.S. Attorney's Office
District of Connecticut
157 Church St., 23rd floor
New Haven, CT 06510

_____
William J. Kelleher III