UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------X
SECURITIES AND EXCHANGE       :
COMMISSION                    :
                              :
          v.                  :    NO. 3:04cv1342 (EBB)
                              :
WILLIAM A. DIBELLA AND        :
NORTH COVE VENTURES, LLC.     :
                              :
-----------------------------X
```

## **RULING ON PLAINTIFF'S MOTION FOR FINAL JUDGMENT AGAINST**

## **DEFENDANTS**

On the basis of the unanimous jury verdict in this case, Plaintiff, the Securities and Exchange Commission ("SEC"), moves for an entry of final judgment finding Defendants William DiBella ("DiBella") and North Cove Ventures, LLC ("North Cove") liable for aiding and abetting violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and §206(2) of the Investment Advisors Act of 1940 (the "Advisors Act") [15 U.S.C. § 80b-6(2)]. In addition, the SEC asks this Court to (1) issue a permanent injunction enjoining DiBella from future violations of the securities laws, (2) permanently enjoin DiBella from serving as an officer or director of a publicly held company, (3) order disgorgement of DiBella's ill-gotten gains in the amount of $374,500, plus prejudgment interest on this amount for the period from March 31, 1999 through March 4, 2008, and (4) order a civil

penalty of $374,500.[1]  The Court held a hearing on the SEC's requested relief on March 4, 2008.  For the reasons set forth below, the SEC's motion is GRANTED IN PART and DENIED IN PART.  The Court finds Defendants DiBella and North Cove each liable for aiding and abetting (a) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and (b) violations of §206(2) of the Investment Advisors Act of 1940 (the "Advisors Act") [15 U.S.C. § 80b-6(2)].  In addition, for reasons explained below, the Court orders DiBella to disgorge the $374,500 he received as a result of his violation of the securities laws, as well as pay $307,127.45 in pre-judgment interest on this sum.  In addition, the Court imposes a civil penalty of $110,000 on DiBella.  However, the Court finds that neither a permanent injunction nor an officer/director bar is warranted in this case.

## DISCUSSION

This Court assumes familiarity with the factual and procedural background recounted in several prior rulings on this case, as well as the evidence adduced during the trial of this case.  Thus, this ruling sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, the SEC's motion for relief.

---

[1] Because DiBella has testified that North Cove has been dissolved, and in light of the relief sought against DiBella, the SEC is requesting a finding of liability as to North Cove but no other relief. [Doc. No. 122 at 4].

Paul Silvester ("Silvester") served as the Connecticut State Treasurer from July 1997 until January 1999. In this capacity, Silvester made investment decisions for the benefit of the Connecticut Retirement and Trust Funds ("Pension Fund"). In or around the fall of 1997, DiBella introduced Silvester to Joseph Grano Jr., the president of Paine Webber, a stock brokerage firm. Pursuant to that meeting, Silvester ultimately invested $100 million of Pension Fund assets into a real estate trust with Paine Webber. Both Silvester and DiBella were under the impression that DiBella would receive a "finder's fee" in exchange for his placement services in this deal.

In or around August of 1998, Thayer Equity Partners IV ("Thayer IV"), a private equity firm in Washington D.C., began soliciting the Connecticut Treasurer's office for an investment. The State's treasury investment officer recommended an investment of up to $25 million of limited partnership interest in Thayer IV. In November of 1998, both Silvester and DiBella learned that DiBella would not be receiving a finder's fee from the Paine Webber deal. Shortly thereafter, Silvester suggested to DiBella that he call Fred Malek ("Malek"), the chairman of Thayer IV and its affiliates, and negotiate a deal as a finder or placement agent for the Thayer IV-Pension Fund investment, even though DiBella played no role in introducing the Thayer investment opportunity to the Pension Fund. DiBella and Malek later met and negotiated a

compensation package worth 0.7% of the total Pension Fund investment in Thayer IV. Thereafter, DiBella asked Silvester to increase the Pension Fund's investment from $50 million to $75 million, which Silvester did.[2] In total, Thayer IV paid DiBella, through North Cove Ventures, $374,500.

The jury found that Silvester's and Malek's actions violated the Exchange Act and the Advisor's Act, respectively, and that DiBella and North Cove were liable for aiding and abetting both violators. After this Court denied Defendants' motion for judgment as a matter of law and motion for a new trial, the SEC filed the instant motion seeking an entry of final judgment against the Defendants and the aforementioned forms of relief.

## I. Disgorgement

In the exercise of its broad equitable powers, a district court may order the disgorgement of profits obtained through the violation of federal securities laws. SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972). "[T]he primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997). The disgorgement amount need only be a "reasonable approximation of profits causally connected to the violation," and "'any risk of

---

[2]After Silvester left office, his successor as State Treasurer, Denise Nappier, reduced the investment by the Pension Fund in Thayer IV to $53.5 million.

uncertainty [in calculating disgorgement] should fall on the wrongdoer whose conduct created that uncertainty.'" SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995), quoting First City Fin.Corp., Ltd., 890 F.2d 1215, 1231-32 (D.C. Cir. 1989). Because disgorgement is remedial and not punitive, "the court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." SEC v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983).

Here, it is uncontested that DiBella received $374,500[3] from the Thayer entities. See, e.g. Jury Charge, at 3-4 (Stipulations E, G, and H); 5 Tr. 151-52[4]. Although DiBella cites cases where courts denied or reduced disgorgement amounts, the courts in these cases concluded that there was insufficient evidence of what the defendant's profit was, if any. See SEC v. Todd, No. 03CV2230, 2007 WL 1574756, at *18 (S.D. Cal. May 30, 2007) (no disgorgement where the SEC failed to show that the amount it sought represented the defendant's unjust enrichment and was a reasonable approximation of the defendant's ill-gotten gains); SEC v. Jones, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (no disgorgement where the SEC was "unable to set forth any evidence of specific profits subject to disgorgement"); SEC v. Cohen, No. 4:05CV371, 2007 WL

---

[3]DiBella continues to assert this payment was lawful. However, the jury unanimously found that the $374,500 DiBella received was a result of the Silvester's fraudulent scheme, which DiBella aided and abetted.

[4]Citations to "Tr." are to the transcripts of the trial. The number preceding "Tr." indicates the volume number of the transcript.

1192438, at *21 (E.D. Mo. April 19, 2007) (no disgorgement where the SEC had "not shown that defendant obtained any ill-gotten gains or unjust enrichment from his actions").[5]  In this case, there is unrebutted evidence of a specific amount of DiBella's ill-gotten gains: $374,500.

DiBella also argues that, should this Court order disgorgement, it should offset the taxes he paid on the $374,500. He states that "taxes paid by a defendant are properly considered as a setoff or deduction where a defendant can establish the amount of taxes paid." Def's. Mem. in Opp. to Pl's. Mot. at 25 [Doc. No. 125].

In SEC v. McCaskey, No. 98CIV6153, 2002 WL 850001 (S.D.N.Y. March 26, 2002), which DiBella cites, the court stated that "[c]ourts in this Circuit consistently hold that a court may, *in its discretion*, deduct from the disgorgement amount any *direct transaction costs*, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit." 2002 WL 850001, at *4 (emphasis added) (citing half a dozen cases where courts had offset broker commissions and fees from the disgorgement remedy); see also

---

[5]DiBella also cites SEC v. McCaskey, No. 98CIV6153, 2002 WL 850001 (S.D.N.Y. Mar. 26, 2002) and SEC v. Platinum Inv. Corp., No. 02 Civ 6093, 2006 WL 2707319 (S.D.N.Y. Sept. 20, 2006), both of which are unavailing.  In McCaskey, the court found disgorgement inappropriate where the defendant's profits were more than offset by his losses during his trading manipulation scheme.  2002 WL 850001, at *10.  In Platinum Inv. Corp., the Court declined to impose joint and several liability on a defendant who was a  "small player in the fraud", requiring him instead to disgorge only his personal pecuniary gain – exactly what the SEC seeks by asking this Court to order DiBella to disgorge the $374,500 he received.

SEC v. Rosenfeld, 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001) (stating that "[a] court may in its discretion, deduct from the defendant's gross profits certain expenses incurred *while garnering* the illegal profits, including . . . transaction costs such as brokerage commissions.") (emphasis added). However, DiBella does not seek an offset of the transaction costs associated with his ill-gotten profits. Rather, he seeks an offset of the state and federal income taxes he paid on these profits. The taxes he paid are not transaction costs. As the Southern District of New York has noted, "the deduction from the disgorgement amount that [the Defendant] seeks for general income taxes does not fall within the class of deductions occasionally allowed for transaction-specific costs." SEC v. Zwick, No. 03 Civ. 2742, 2007 WL 831812, at *24 (S.D.N.Y. March 16, 2007), citing SEC v. World Gambling Corp., 555 F.Supp. 930, 935 (S.D.N.Y. 1983) (stating that "[t]he 'profit obtained' cannot be said to be a punitive standard for disgorgement, even thought it may be slightly overstated by overhead and income taxes...."); see also SEC v. Svoboda, 409 F. Supp. 2d 331, 345 (S.D.N.Y. 2006) (the defendant "has failed to identify any legal authority supporting the deduction of capital gains taxes from illicit trading gains.").

Thus, the appropriate disgorgement amount is $374,500.

## II. Prejudgment Interest

The SEC also seeks an award of prejudgement interest on

DiBella's ill-gotten gains in the amount of $307,127.45. This amount reflects an interest period from April 1, 1999 (the date that DiBella received the final payment from Thayer) through March 1, 2008. It is calculated using the IRS underpayment rate, which is an appropriate interest rate to use in calculating prejudgement interest. See SEC v. First Jersey Secs., 101 F.3d 1450, 1476 (2d Cir. 1996) (stating that "the rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud.").

Like disgorgement, a district court has the broad discretion to order prejudgment interest to ensure that violators do not profit from illegal activity. SEC v. Universal Express, Inc., 475 F. Supp.2d 412, 428 (S.D.N.Y. 2007). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." SEC v. Moran, 944 F.Supp. 286, 295 (S.D.N.Y.1996). In considering whether to award prejudgment interest, a court should consider "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." First Jersey, 101 F.3d at 1476 (internal quotation marks omitted). "In an enforcement action

brought by a regulatory agency, the remedial purpose of the statute takes on special importance." Id.

Based on these factors, DiBella argues that an award of prejudgement interest would not be equitable because of the "remote and secondary nature of the aiding and abetting violations", Def's. Mem. in Opp. to Pl's. Mot. at 29 [Doc. No. 125] and the fact that it was his first and only offense. DiBella also argues that there was no injury to the Pension Fund because he was not paid by the Pension Fund or the State of Connecticut.

First, the Court notes that DiBella's repeated attempts to downplay his role in this scheme by stating that he was "remote from the primary actors", id. at 35, or "indisputedly a secondary actor", id. at 26, completely ignores the fact that the purpose of this scheme was to compensate DiBella. As the SEC points out, DiBella was the reason and beneficiary for the fraud, a fact of which he was well aware. Second, courts have not hesitated to order prejudgment interest even where the defendant was a first time offender. See, e.g. SEC v. Patel, 61 F.3d 137 (2d Cir. 1995); SEC v. Svoboda, 409 F.Supp.2d 331 (S.D.N.Y. 2006). Third, *assuming arguendo* that the Pension Fund was not injured by DiBella's conduct, the remedial purposes of the statute, namely, to ensure that DiBella does not receive what amounts to an interest free loan as a result of his illegal conduct, weighs in favor of this court exercising its discretion and ordering prejudgment

interest.

DiBella also argues that the prejudgment interest sought by the SEC — $307,127.45 — is excessive and punitive rather than remedial because it is almost as much as the disgorgement amount. Def's. Mem. in Opp. to Pl's. Mot. at 30 [Doc. No. 125]. However, in SEC v. First Jersey, the Second Circuit found no abuse of discretion where the prejudgment interest awarded, $52,689,894, was more than double the disgorgement amount of $22,288,099. 101 F.3d at 1476.

Next, DiBella argues that awarding prejudgment interest for the full nine years between his violation and the present is unwarranted because of delays in the litigation of this case, including the SEC's five year delay in filing this action.

In First Jersey, the Second Circuit considered and rejected an argument that a prejudgment interest award should be reduced because of the SEC's delay, stating: "[n]or are we persuaded that it was inappropriate to order that prejudgment interest be paid for the entire period from the time of defendants' unlawful gains to the entry of judgment. Even if defendants were correct that the present litigation was protracted through some fault of the SEC, defendants plainly had the use of their unlawful profits for the entire period . . . [g]iven the remedial purpose of the statute, the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants, we see no abuse of

discretion in the court's order." <u>SEC v. First Jersey</u>, 101 F.3d at 1477; <u>see also</u> <u>SEC v. Warde</u>, 151 F.3d 42, 49 (2d Cir. 1998) (citing <u>SEC v. First Jersey</u> and holding that a defendant's argument that he should not be liable for the total amount of prejudgment interest because of the SEC's nine-year delay in bringing the action was "without merit"); <u>SEC v. Svoboda</u>, 409 F.Supp.2d at 346 (allegation that SEC delayed pursuing its complaint for over four years did not warrant reduction of prejudgment interest as defendants had use of their unlawful profits for the entire period). Similarly, DiBella had use of his unlawful profits from April 1, 1999 until the present.

DiBella's reliance on cases where courts reduced the prejudgment interest period or interest rate is misplaced. In <u>SEC v. United Energy Partners</u>, No. Civ.A. 3:98CV0218R, 2003 WL 223392, at *2 (N.D. Tex. Jan 28, 2003), the court utilized an interest rate that was one-half of the IRS underpayment rate for the period of time during which a court appointed receiver controlled the unlawful profit and the defendants had no "access to or control of the funds." In <u>SEC v. Rubin</u>, No. 91 CIV. 6531, 1993 WL 405428, at *7 (S.D.N.Y. Oct. 8, 1993), the court declined to impose prejudgment interest against a defendant where there was no evidence of "[ ]either profit . . . [ ]or any discernible benefit" to the defendant from the violation. Finally, DiBella cites <u>SEC v. Monarch Funding Corp.</u>, No. 85 Civ. 7072, 1996 WL 562983

11

(S.D.N.Y. Oct. 3, 1996), where the prejudgment interest awarded was discounted to reflect the seven years during which the case had been placed on the suspense docket. However, in that case, both parties had agreed to suspend the litigation for seven of the twelve years that the case was being litigated. Moreover, although the district court in that case stated that "the Second Circuit has indicated that it may be appropriate to eliminate or reduce prejudgment interest if the plaintiff bears responsibility for delays in moving the case forward", 1996 WL 562983, at *2, the case was decided two months before the Second Circuit issued its decision in <u>SEC v. First Jersey</u>, where it explicitly held that the SEC's alleged delay in the litigation did not warrant a reduction in the prejudgment interest rate. 101 F.3d at 1477. In addition, as already indicated, <u>SEC v. First Jersey</u> has been cited in subsequent Second Circuit and district court decisions to uphold prejudgment interest awards in similar circumstances.

DiBella's final argument is that the prejudgment interest sought by the SEC was computed based on an overstated disgorgement – the full $374,500 – rather than a lesser amount that would offset the taxes he paid on this amount. However, because the full $374,500 is the proper disgorgement amount, this argument is also without merit.

Thus, the Court orders DiBella to pay prejudgment interest in the amount of $307,127.45.

## III. Civil Penalty

The SEC asks this court to authorize a civil penalty in the amount of $374,500, which represents DiBella's ill-gotten gains. Although the SEC characterizes DiBella's conduct as warranting a third-tier penalty under the securities laws, the Court notes that under any penalty tier, the court may impose a penalty equal to the "gross amount of pecuniary gain to such defendant as a result of the violation."[6]

_____

[6] Finding that disgorgement alone insufficiently deters securities laws violations because it merely restores the *status quo ante*, Congress amended the Exchange Act by enacting the Securities Enforcement Remedies Act and Penny Stock Reform Act of 1990 ("Remedies Act"), 15 U.S.C. § 78u(d)(3), to further "the dual goals of punishment of the individual violator and deterrence of future violations." <u>SEC v. Coates</u>, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001) (internal citations and quotation marks omitted). The Remedies Act provides that the SEC may bring an action in a district court to seek the imposition of a civil penalty on "any person [who] has violated any provision of this chapter, the rules or regulations thereunder. . . upon a proper showing . . . ." 15 U.S.C. § 78(u)(d)(3)(A). The Act sets up three tiers of penalties – first-tier, second-tier, and third-tier – as set forth below.
For first-tier penalties, the amount of the penalty "shall be determined by the court in light of the facts and circumstances", and for each violation, the penalty "shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 78u(d)(3)(B)(I); 15 U.S.C. § 80b-9(e)(2)(A)
For second-tier penalties, the penalty "shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of this violation, if the violation ... involved fraud, deceit, manipulation, or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii); 15 U.S.C. § 80b-9(e)(2)(B)
For third-tier penalties, the penalty "shall not exceed the greater of $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation if (aa) the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 80b-9(e)(2)( c ). In addition, 17 C.F.R. § 201.1001 provides an inflationary adjustment to the statutory penalties for violations occurring, as here, after December 9, 1996 and before February 2, 2001. Thus, the statutory penalty for a natural person is $6,500 for a first tier violation, $55,000 for a second tier violation, and $110,000 for a third-

"Congress enacted civil penalties to punish and deter securities law violations, and such penalties may be imposed in addition to disgorgement and injunctive relief." SEC v. Tanner, No. 02 Civ. 0306, 2003 WL 21523978, at *2 (S.D.N.Y. July 3, 2003) (citations omitted); SEC v. Opulentica, 479 F. Supp. 2d 319, 332 (S.D.N.Y. 2007) (stating that civil penalties are designed to punish the individual violator and deter future violations of the securities laws). "Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught." SEC v. Opulentica, 479 F. Supp.2d at 332, quoting SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002) (internal quotation marks omitted).

In determining whether civil penalties should be imposed, and the amount of the fine, courts consider (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. See SEC v.

---

tier violation.

<u>Opulentica</u>, 479 F. Supp. 2d at 331; <u>SEC v. Coates</u>, 137 F. Supp.2d 413, 428-29 (S.D.N.Y. 2001) (listing factors).[7] While these factors are helpful, the civil penalty framework is of a "discretionary nature", and each case has "its own particular facts and circumstances which determine the appropriate penalty to be imposed." <u>SEC v. Moran</u>, 944 F. Supp. at 296-97.

As a preliminary matter, DiBella's claim that SEC's request for any civil penalty should be denied on the ground that his offense was merely aiding and abetting is without merit. Courts have consistently imposed civil penalties on aiders and abettors of securities law violators. <u>See</u>, <u>e.g.</u> <u>SEC v. Ramoil Management, Ltd.</u>, No. 01 Civ. 90572007 WL 3146943, at *13 (S.D.N.Y. Oct. 25, 2007) [imposing $100,000 civil penalty on aider and abettor ($10,000 per violation), even while acknowledging that the defendant was "not the primary wrongdoer" and "gained nothing from his actions"]; <u>SEC v. Zwick</u>, 2007 WL 831812, at *27 (finding an aider and abettor subject to a third-tier penalty because his conduct involved fraud, deceit and deliberate manipulation and resulted in substantial losses to the victim).

Furthermore, the cases DiBella cites do not lend support to

---

[7]Other courts in this Circuit have also included consideration of "defendants' failure to admit to their wrongdoing . . . [and] defendants' lack of cooperation and honesty with authorities, if any . . ." <u>See</u>, <u>e.g.</u> <u>SEC v. Lybrand</u>, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003) (citing cases); <u>SEC v. Zwick</u>, 2007 WL 831812, at *27.

his contention that the Court should, at most, impose a first-tier penalty of $5,000. In <u>SEC v. Inorganic Recycling Corp.</u>, the court declined to impose a civil penalty against a defendant not only because he was a lesser beneficiary of the fraudulent scheme, but also because he had "demonstrated substantial and meaningful contrition by his prompt and significant cooperation in the criminal investigation . . .". 2002 WL 1968341, at *5. The Court concluded that "such cooperation is important to the investigation, prosecution and punishment of frauds of this kind, and should be rewarded." <u>Id.</u> In <u>SEC v. Opulentica, LLC</u>, the Court similarly cited the defendant's prompt and significant cooperation in the criminal investigation as a justification for imposing a $5,000 civil penalty. 479 F. Supp 2d at 332. In <u>SEC v. Slocum, Gordon & Co.</u>, the court imposed a first-tier penalty not only because no losses were demonstrated, but also because the defendants' "only securities violations were non-scienter based, technical violations." 344 F. Supp. 2d 144, 185-86 (D. R.I. 2004). In <u>SEC v. Todd</u>, the defendants were found liable for aiding and abetting violations of § 13(a) of the Exchange Act (the "reporting provisions") and § 13(b)(2)(A) of the Exchange Act and Rule 13b2-1 thereunder (the "books and records provisions"). 2007 WL 1574756, at *14-16. The Court explicitly stated that these aiding and abetting violations were non-scienter based, and declined to hold the defendants liable for violations that would have involved

scienter. In light of the fact that "[d]efendants acted without scienter", id., at *17, the Court found first-tier monetary penalties appropriate. Id. at *19. In SEC v. Snyder, 2006 U.S. Dist. LEXIS 81830 (S.D. Tex. Aug. 22, 2006), the Court held that "although the jury found that the defendant was at least severely reckless in his actions, in light of these other circumstances, civil penalties are not warranted." Id. at *37. These other circumstances included the defendant's production of "substantial evidence of his good faith at trial" as well as evidence of the "financial hardship and extreme emotional toll" the defendant had suffered, "the lack of egregiousness of the violations at issue, the isolated nature of Defendant's actions, [and] the sincerity of Defendant's assurances against future violations . . ." Id. Finally, in SEC v. Moran, the court imposed a first tier penalty of $5,000 against an individual defendant because that defendant "acted with negligence and apparently had no intent to violate the law." 944 F. Supp. at 297. Even though the defendant's conduct (a violation of Section 206(2) of the Adviser's Act) "constituted a fraud upon his clients", the Court concluded that there "is an unmistakable difference between conduct which negligently operates as a fraud when compared to conduct engaged in with the intent to defraud . . .". Id.

Except for the fact that DiBella's conduct was isolated, the cases cited above cannot be compared to the instant case.

17

DiBella's violation was not a non-scienter based, technical violation. Rather, DiBella acted with scienter[8] and was a principal beneficiary of the fraudulent scheme. In addition, there is nothing to suggest that any penalty should be reduced due to his financial condition.[9]

The SEC asks this Court to impose a third-tier civil penalty. In order to so do, the Court must find that DiBella's violation "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement," and that the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 78u(d)(3)(B)(iii), 80b-9(e)(2)(c).

The Court finds a third-tier penalty is appropriate in this case. First, DiBella's violation clearly involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement. He admitted that he was not the finder on the Thayer

---

[8]Although DiBella repeatedly asserts that he was "merely a secondary actor", the jury in this case was properly instructed that, in order to be found liable for aiding and abetting, the SEC was required to prove by a preponderance of evidence that Defendants acted knowingly or recklessly. The jury's finding of liability supports a finding that DiBella acted with scienter. See ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 n.3 (2d Cir. 2007) (stating that "in a Rule 10b-5 action, scienter requires a showing of intent to deceive, manipulate, or defraud, or reckless conduct . . .") (internal citations and quotation marks omitted).

[9]DiBella also has neither cooperated with the SEC's investigation nor demonstrated "substantial and meaningful contrition". Although this is not a factor in this Court's consideration of the appropriate civil penalty to be imposed, it further indicates that his reliance on the cases cited above is misplaced.

IV deal, that it was his understanding that Silvester put him on the deal to make up for the Paine Webber deal, and that he had a general awareness that Silvester's conduct was improper. 5 Tr. 117, 122. Although he continues to assert that his conduct was lawful, he acknowledged during the trial of this case that Silvester told him to call Malek and work out a deal as a finder, even though, at the point, DiBella had no idea who Malek was or what Thayer was. 5 Tr. 65-66.

Second, DiBella admitted that he asked Silvester to increase the Pension Fund's investment in Thayer Capital from $50 million to $75 million with no understanding of whether or not $75 million would be an appropriate investment amount for the State of Connecticut. 5 Tr. 78-81. He acknowledged that "one of the results" of this increased investment would be an increased fee for him. Id. Although it is not clear whether DiBella's conduct actually caused injury to the Pension Fund, it is clear to this Court that his encouragement of a higher investment, without any understanding of whether or not it would be in the best interests of the Fund, created a significant risk of substantial losses to the Fund.

Under the third-tier, a civil penalty cannot exceed $110,000 for a natural person or the gross amount of pecuniary gain to a defendant as a result of the violation. 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 80b-9(e)(2)(c); 17 C.F.R. §

201.1001.[10] Courts have, upon finding a third-tier civil penalty appropriate, routinely imposed an amount representing the defendant's gross pecuniary gain even where that amount far exceeds $100,000. See e.g. SEC v. Invest Better 2001, No. 01 Civ 11427, 2005 WL 2385452, at *4-5 (S.D.N.Y. May 4, 2005) (third-tier penalty of $1,273,731, equal to the defendant's gross pecuniary gain, appropriate where defendant committed multiple securities violations involving outright fraud and deceit which resulted in substantial losses to nearly 5,000 victims, where defendant continued his unlawful conduct even after contacted by the SEC, where defendant's "disdain for the law" was apparent by his convictions for bank, mail and wire fraud after being enjoined from violating securities law, and where defendant's "protestations of poverty" were not credible); SEC v. Universal Exp. Inc., 475 F. Supp. at 429 [third-tier penalty equal to gross amount of pecuniary gain ($1,419,025 for one defendant and $361,311 for the other) appropriate where defendants, described as "repeated and remorseless", "engaged in numerous and inexcusable instances of securities laws violations over the course of at least four years and gained substantial monies in relation to these violations – which included fraud at the likely expense of [shareholders] and

---

[10]17 C.F.R. § 201.1001 provides an inflationary adjustment to the statutory penalties for violations occurring, as here, after December 9, 1996 and before February 2, 2001. Thus, the statutory penalty for a natural person is $6,500 for a first tier violation, $55,000 for a second tier violation, and $110,000 for a third-tier violation.

the investing public"); <u>SEC v. Rosenfeld</u>, 2001 WL 118612, at *4
(third-tier penalty equal to defendant's gross pecuniary gain of
$1,093,189 appropriate where defendant's scheme defrauded
investors, created substantial losses or a significant risk of a
substantial loss to investors who purchased stock at inflated
prices, and included the distribution of unregistered stock, the
filing of false reports with the SEC and the falsification of
accounting records).

On the other hand, courts have also chosen to impose a
$100,000 civil penalty even where the gross pecuniary gain far
exceeded that amount. For example, in <u>SEC v. Save The World Air,
Inc.</u>, No. 01 Civ. 11586, 2005 WL 3077514, at *20 (S.D.N.Y. Nov. 15,
2005), the district court found a third-tier penalty appropriate
where defendant engaged in "a broad range of fraudulent conduct
over a lengthy period of time, and where the victims
"unquestionably sustained – or faced a significant risk of
sustaining substantial losses" as a consequence of the defendant's
misconduct. However, the Court chose to impose a third-tier civil
penalty of $100,000, which was "substantially less" than the $7.5
million disgorgement amount. <u>Id</u>. at 21. <u>See also</u> <u>SEC v. Roor</u>, No.
99 Civ. 3372, 2004 WL 1933578, at *10-*11 (S.D.N.Y. Aug. 30, 2004)
(third-tier penalty of $100,000 for a defendant ordered to disgorge
$1 million, where sufficient deterrent from criminal restitution
and disgorgement ordered against the defendant, coupled with his

incarceration); <u>SEC v. Inorganic Recycling Corp.</u>, 2002 WL 1968341, at *5 (where defendant engaged in a "reprehensible scheme", including grand larceny of $50,000 from investors, and ordered to disgorge $1,135,764, third-tier penalty of $100,000 appropriate in "view of the size of the other financial components of the judgment" and where defendant's financial situation indicated that recovery of a civil penalty equal to the disgorgement amount would be unlikely).

On the facts and circumstances of this case, the Court orders DiBella to pay a civil penalty of $110,000. Although DiBella acted with scienter and was the principal beneficiary of the fraudulent scheme, the Court notes that his conduct was isolated. A third-tier penalty of $110,000 adequately fulfills the deterrent and punitive purposes of the statute.

## IV. Officer/Director Bar

Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), provides that a person may be barred or suspended from serving as an officer/director of any public company if the person violated the antifraud provisions, 15 U.S.C. § 78j(b)[11], and displays

---

[11]15 U.S.C. § 78j(b), codifying Section 10(b) of the Exchange Act, provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

"unfitness to serve as an officer/director."

As a preliminary matter, DiBella argues that the Court has no authority to impose a bar because "he has not been found to have violated one of the antifraud provisions of the securities laws that could trigger an officer and director bar," because "his offense was a secondary, aiding and abetting violation, not an intentional fraud case."  Def's. Mem. in Opp. to Pl's. Mot. at 18 [Doc. No. 125].  This argument is without merit.

The "antifraud provisions" referenced in Section 21(d)(2) of the Exchange Act are found in Section 10(b) of the Act.  In <u>Central Bank of Denver, N.A.  v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164, 114 S.Ct. 1439 (1994), the Supreme Court held that a private party cannot maintain an action for aiding and abetting violations of Section 10(b).  However, a year after <u>Central Bank</u> was decided, Congress enacted  the Private Securities Litigation Reform Act of 1995 ("PSLRA").  In this legislation, Congress carved out an exception to <u>Central Bank</u> and specifically authorized the SEC to bring enforcement actions for aiding and abetting violations of the antifraud provisions of Section 10(b). 15 U.S.C. § 78t(e). Specifically, the statute was amended to provide that:

> "[f]or purposes of any action brought by the
> Commission under paragraph (1) or (3) of section
> 78u(d) of this title, any person that knowingly
> provides substantial assistance to another person
> in violation of a provision of this chapter, or of
> any rule or regulation issued under this chapter,
> shall be  deemed  to  be  in  violation  of  such

provision to the same extent as the person to whom
such assistance is provided." Id.

Paragraphs (1) and (3) of Section 78u(d) authorize a district court to enjoin a person from future violations of securities laws and to impose civil monetary penalties. 15 U.S.C. §§ 78u(d)(1), (3).  Although paragraph (2), which authorizes a district court to prohibit persons from serving as officers and directors, is not explicitly mentioned in Section 78t(e), the text of paragraph (2) provides:  "In any proceeding under paragraph (1) of [Section 78u(d)], the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated [the antifraud provisions] from acting as an officer/director . . ."  15 U.S.C. § 78u(d)(2).

In short, from the text of the statute, it is clear that a person found to have aided and abetted a violation is as liable as the principal.  In addition, while paragraph (2) is not explicitly mentioned in the statute, the statute provides that in an injunction proceeding brought pursuant to paragraph (1), a court may issue an officer/director bar.

The question the Court must consider, then, is whether DiBella has displayed "unfitness to serve as an officer/director".  15 U.S.C. § 78u(d)(2).  To determine whether a defendant is unfit, the following factors may be considered: "(1) the 'egregiousness' of

24

the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." SEC v. Patel, 61 F.3d at 141 (internal citations and quotation marks omitted). These factors are not exclusive, nor is it necessary to apply all of these factors in every case. Id. "A district court should be afforded substantial discretion in deciding whether to impose a bar to employment in a public company." Id. In addition, although "it is 'not essential' that a defendant have committed past violations before a lifetime ban is imposed, it is 'essential, in the absence of such violations, that a district court articulate the factual basis for a finding of the likelihood of recurrence.'" SEC v. Save The World Air, Inc., 2005 WL 3077514, at *16, quoting SEC v. Patel, 61 F.3d at 141. In SEC v. Patel, the Second Circuit explicitly noted that the "loss of livelihood and the stigma attached to permanent exclusion from the corporate suite certainly require[d] more" than using a general statement that the defendant "used his position as an officer and director to engage in misconduct" as an indication that future misconduct would likely occur. 61 F.3d at 141-42. The Court also stated that "before imposing a permanent bar, a court should also 'consider whether a conditional bar (e.g. a bar limited to a particular industry) and/or a bar limited in

time (e.g. a bar of five years) might be sufficient, especially where there is no prior history of unfitness." Id.[12]

District courts have used the six factors identified in SEC v. Patel to impose both permanent and conditional bars. SEC v. Zubkis, No. 97 CIV 8086, 2000 WL 218393 (S.D.N.Y. Feb. 23, 2000) (permanent officer/director bar appropriate where defendant sold and distributed unregistered securities, made numerous fraudulent representations over several years in order to induce investors to purchase shares, operated as an unregistered securities broker, and continued to assert that he was not bound by federal securities laws); SEC v. Softpoint, 958 F. Supp. 846 (S.D.N.Y. 1997) (permanent bar ordered where defendant engaged in the sale of unregistered stock, falsified accounting records, signed and filed false reports with the SEC, and continued his misconduct even during the SEC's investigation); SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 530 (D.N.J. 1999) (applying the Second Circuit factors in SEC v. Patel and applying a temporary five-year ban to a co-defendant whose behavior and culpability were similar to defendant who received "the severe penalty of a permanent bar", but

---

[12]The Sarbanes-Oxley Act of 2002 changed the standard of unfitness from "substantial unfitness" to simply "unfitness" – a move intended to make it easier for the SEC to obtain an officer/director bar against securities laws violators. See S. Rep. No. 205, 107th Cong. 2nd Sess. 26-27, 53 (2002). Notwithstanding this change, courts have continued to cite Patel and/or use the Patel factors in determining whether an officer/director bar is appropriate. See, e.g. SEC v. Save The World Air Inc., 2005 WL 3077514, at *16; SEC v. Global Telecom Services, LLC, 325 F. Supp. 2d 94, 121 (D. Conn. 2004).

whose status as a one-time offender meant that "the likelihood of future violations [was] not as clear"); <u>SEC v. Farrell</u>, No. 95-CV-6133T, 1996 WL 788367, at *8 (W.D.N.Y. Nov. 6, 1996) (although defendant's "securities violations were serious and he did engage in fraudulent conduct in the hopes that his illegal activities would not be discovered", permanent officer/director bar limited to banking and financial institutions); <u>SEC v. McCaskey</u>, No. 98 CIV. 6153, 2001 WL 1029053 (S.D.N.Y. Sept. 6, 2001) (temporary six-year bar ordered where defendant, the director and largest shareholder of his company, traded stock to and from his accounts through "washed sales", "matched orders" and other transactions designed to create the illusion of active trading in order to artificially increase stock price, and had previously been found in violation of securities regulations).

Even before <u>Patel</u>, courts focused on a defendant's high degree of scienter, number of violations, and likelihood of future violations in determining whether or not to issue a permanent officer/director bar. For example, in <u>SEC v. Drexel Burnham Lambert Inc.</u>, 837 F. Supp. 587 (S.D.N.Y. 1993), <u>aff'd</u>, <u>SEC v. Posner</u>,16 F.3d 520 (2d Cir. 1994), the district court applied a permanent officer/director bar as an equitable remedy[13] where the

---

[13]Although the relevant conduct in <u>Drexel</u> occurred prior to the passage of the Securities Law Enforcement Remedies Act in 1990, which contained the statutory authority for the officer/director bar, Securities Act § 20(e), 15 U.S.C. § 77t(e); Exchange Act § 21(d)(2), 15 U.S.C. § 78u(d)(2); S.Rep. No. 337, 101st Cong., 2d Sess. 22 (1990), the Court noted that this Act "codified the inherent authority of the federal courts-which had theretofore been

27

defendants' violations were egregious, they engaged in fraudulent
activities in their corporate capacities, they typically held
controlling interest in their companies so that public shareholders
lacked sufficient control to remove them from office, and they were
recidivists who had committed federal securities law violations
even after permanent injunctions had been issued against them.     In
fact, the defendants had twice been sued  by the SEC for engaging
in securities law violations, and, in each case, had consented to
the issuance of injunctions prohibiting them from engaging in
future violations of the anti-fraud and reporting provisions of the
securities laws.    <u>Id</u>. at 602-03.    In addition, one of the
Defendants had previously been convicted of tax fraud.  <u>Id</u>.    In
light of the Defendants' conduct, their ability to commit future
securities law violations, and the lack of assurances that they
would refrain from committing future violations, the District Court
permanently barred the Defendants from serving as officers and
directors of any reporting company, noting that it "would serve
little purpose for the Court to issue yet another injunction
against such recidivist violators without at the same time granting
ancillary relief calculated to ensure that, this time, they comply

recognized and exercised by the courts-to issue orders in appropriate
circumstances barring individuals from acting as officers or directors of
public companies."  <u>SEC v. Drexel</u>, 16 F.3d at 613.  The Court also noted that
even "[i]ndependent of the statute, the Court has authority pursuant to its
general equitable powers to order the relief requested by the SEC."  <u>Id</u>.,
<u>citing</u> <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972)
(stating that "[o]nce the equity jurisdiction of the district court has been
properly invoked by a showing of a securities law violation, the court
possesses the necessary power to fashion an appropriate remedy").

with the Court's mandate." Id. at 613. In affirming this remedy, the Second Circuit held that the findings that the defendants "had committed securities law violations with a 'high degree of scienter' and that their past securities law violations and lack of assurances against future violations . . . amply support the [district court's] conclusion that the officer and director bar was necessary to protect public investors." Posner, 16 F.3d at 522.

The circumstances of this case are very different from the cases cited above, and lead this Court to conclude that an officer/director bar is not warranted. DiBella does not currently serve on the boards of any publically traded companies, and has never served as an officer of any publically traded company. In prior roles as a director of two separate companies (over 10 years ago), DiBella was never found to have committed securities violations. Although DiBella acted with scienter, he is not the type of "repeat offender" for whom an officer/director bar is especially appropriate. The conduct at issue in this case constitutes his first and only violation of the securities law. Applying the factors in Patel, the Court finds that there is insufficient evidence that an officer/director bar is warranted. See, e.g. Patel, 61 F.3d at 141-42 (reversing district court grant of an officer bar where defendant abused his officer position, showed "some scienter" and was the sole economic beneficiary of his actions, but where defendant was a first-time offender and the SEC

failed to demonstrate the likelihood of future misconduct); Snyder, 2006 U.S. Dist. LEXIS 81830, at *18-27 (applying the Patel factors and holding that although the defendant acted with scienter and had an economic stake in the violation, an officer/director bar was "unnecessary and unwarranted" in light of "[t]he lack of egregiousness, the isolated nature of Defendant's actions, and the strong unlikelihood of Defendant's ever obtaining another officer/director position or committing future violations") SEC v. Shah, No. 92 Civ. 1952, 1993 WL 288285, at *7 (S.D.N.Y. July 28, 1993) (citing the factors eventually adopted by Patel and finding an officer/director bar unwarranted where defendant was an officer during his illegal conduct and pled guilty in related criminal case, but was not a repeat offender, his gain of $121,340 not egregious in comparison with other insider trading schemes, the circumstances of Defendant's actions did not evidence a high degree of scienter, and Defendant was sufficiently punished by other remedies).

The SEC states that there is a reasonable likelihood of reoccurrence because "DiBella has and will continue to have opportunities to use his political influence to commit securities fraud," Pl's. Mem. in Supp. of Mot. at 6 [Doc. No. 122], noting that DiBella was not an officer/director when he committed the aiding and abetting violations in this case. However, even assuming *arguendo* that DiBella is in a position to commit

30

securities fraud should he choose to do so (a fact that DiBella disputes), the SEC has not adequately demonstrated that it lacks assurances against future misconduct.  The misconduct at issue in this case, which occurred ten years ago, was the first and only securities law violation in DiBella's decades of political work. As indicated above, courts that have imposed permanent, and even temporary bars, have found the defendants' past and ongoing conduct to clearly demonstrate a likelihood of reoccurrence – conduct that is not present in this case.  Thus, after considering the totality of the circumstances and all of the relevant factors, the Court declines to impose an officer/director bar.

## V. Permanent Injunction

Section 21(d)(1) of the Exchange Act and Section 209(c)of the Advisers Act authorize the SEC to seek permanent injunctive relief from the Court upon a showing that a person is engaged in or is about to engage in acts of practices constituting a violation of the federal securities laws.  15 U.S.C. §§ 78u(d)(1), 80b-9(c).

"A permanent injunction is a drastic remedy and should not be granted lightly, especially when the conduct has ceased." SEC v. Steadman, 967 F.2d 636, 648 (D.C. Cir. 1992), quoting 1 T. Hazen, The Law of Securities Regulation § 9.5, at 400 (2d ed. 1990) (internal quotation marks omitted). "There must be 'some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" Id., quoting

United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897 (1953). Although "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations," SEC v. Opulentica, LLC, 479 F. Supp. 2d. at 329, quoting SEC v. Platinum Inv. Corp., No. 02 Civ 6093, 2006 WL 2707 319, at *4 (S.D.N.Y. Sept. 20, 2006) (quotation marks omitted), the SEC must "go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 99-100 (2d Cir. 1978) (stating that the SEC "cannot obtain relief without positive proof of a reasonable likelihood that past wrong doing will occur."). Courts consider a number of factors in determining the likelihood of recurrence. These include: "whether the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998). The Second Circuit has noted that a permanent injunction "is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and where the court views the defendant's degree of culpability and continued protestations of innocence as indications

that injunctive relief is warranted . . ." <u>First Jersey</u>, 101 F.3d at 1477 (internal citations and quotation marks omitted). In addition, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts... [a]ccordingly, the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d at 1102.

The SEC contends that factors above compel the imposition of permanent injunctive relief against DiBella. First, it argues that DiBella acted with a high degree of scienter, drawing on facts adduced at the trial demonstrating that DiBella asked Silvester to raise the Pension Fund's investment in Thayer in order to increase his fee, and that DiBella knew Silvester inserted him as a finder into the deal solely to make up for the fact that DiBella did not receive a fee on a prior, unrelated deal. Second, although acknowledging that DiBella's conduct constituted a single securities violation, the SEC argues that DiBella's conduct "was not an isolated incident, but involved a series of discrete actions over the course of several months." Pl's. Mem. in Supp. of Mot. at 5 [Doc. No. 122]. According to the SEC, these discrete actions included entering into the arrangement with State Treasurer Silvester, negotiating a payment with Fred Malek, arranging

documentation that would make the transaction look legitimate, convincing Silvester to raise the Pension Fund's investment in Thayer IV, and accepting payment. Third, the SEC argues that the Court should issue an injunction because of DiBella's "utter failure to admit that there was anything wrong with what he did." Id. The SEC notes that, even during the hearing on relief in this case, DiBella's counsel continued to assert that DiBella's actions were proper. Finally, the SEC claims that an injunction is appropriate because, as a lobbyist and government relations consultant, DiBella is in a position to use his political connections to commit securities fraud in the future.

Upon careful consideration of the totality of the circumstances and all of the relevant factors, the Court finds that a permanent injunction is not warranted in this case. The Court agrees that the fact that DiBella acted with scienter, was found liable for violating securities laws, and continues to assert that he did nothing wrong weigh in favor of granting a permanent injunction. However, there are several factors that weigh against imposing a permanent injunction in this case.

First, this is DiBella's first and only securities violation. While "'first offenders' are not immune from injunctive relief," SEC v. Shapiro, 494 F.3d 1301, 1308 (1974), DiBella's status as a one-time offender, rather than a repeat offender, is relevant to a determination of whether there is a reasonable likelihood that

34

DiBella will commit laws violations if not enjoined.  See SEC v. Jones, 476 F. Supp. 2d at 384.

In addition, as the SEC concedes, DiBella is not regularly employed in the securities industry.  Nonetheless, the SEC argues that DiBella's state political work and lobbying present him with opportunities for federal securities law violations, pointing to the fact that the violation at issue arose from such work.  However, the SEC acknowledges that the conduct at issue in this case is DiBella's first and only violation of securities laws in his decades-long political career.  Furthermore, the passage of nearly 10 years without another violation weighs heavily against an injunction.  See, e.g. SEC v. Jones,  476 F.Supp.2d at 384 (declining to impose an permanent injunction and noting that "several years have passed since Defendants' alleged misconduct apparently without incident"); In re Moskowitz, 2002 WL 434524, Exchange Act Release No. 45,609, 77 SEC Docket 446 (March 21, 2002) (explaining that after six years, "[t]he passage of time since [Defendant's] violative conduct militates against the issuance of a cease-and-desist order"); Proffitt v. F.D.I.C., 200 F.3d 855, 862 (D.C. Cir. 2000) (stating that [w]hile a serious offense, even long past, may indicate [defendant's] current risk to the public, that offense cannot alone determine his fitness almost a decade later.").

Finally, although the SEC argues that DiBella's conduct was

not an "isolated occurrence", the Court is unpersuaded that DiBella's conduct involved the type of "systematic wrongdoing" that would make a permanent injunction particularly appropriate. Although the SEC delineates the different steps DiBella took in aiding and abetting the primary violators in this case, DiBella's acts were all committed in a relatively short time period, and all related to the one underlying fraud – his fraudulent finder's fee. This distinguishes DiBella's conduct from cases where courts have found a defendant's systematic wrongdoing to warrant a permanent injunction. See, e.g. SEC v. Freeman, 290 F. Supp. 2d 401, 405-06 (S.D.N.Y. 2003)(defendant's use of insider information to trade securities on eight separate occasions over two years was not an "isolated instance", but rather a "continuous and systematic pattern"); SEC v. Svoboda, 409 F. Supp. 2d at 343 (finding "systematic wrongdoing" where defendant was engaged in an insider trading scheme that lasted four years, involved twenty issuers, and "employed numerous measures to evade detection"); SEC v. Milan Capital Group, Inc., No. 00 CIV. 108, 2000 WL1682761, at *9 (S.D.N.Y. Nov. 9, 2000) (finding "systematic wrongdoing" where the defendants' IPO scheme involved hundreds of duped investors, and where one defendant's misconduct continued while he was incarcerated, while another defendant converted funds on the eve of a court order freezing those funds); SEC v. McCaskey, 2001 WL 1029053, at *1,5 (finding a "continuing course of wrongful conduct"

justifying a permanent injunction where, over a period of seven months, the defendant traded stock to and from his multiple accounts through transactions designed to create the illusion of active trading in order to artificially inflate the price of his shares).

In sum, the drastic nature of a permanent injunction[14], the single violation, the passage of 10 years since the misconduct, and the lack of evidence, apart from DiBella's continued assertions of no wrongdoing, that could indicate a likelihood of future violations, lead this Court to deny the SEC's request for a permanent injunction.

## Conclusion

For the foregoing reasons, the SEC's motion is GRANTED IN PART and DENIED IN PART. Judgment shall enter against Defendants for aiding and abetting violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and §206(2) of the Investment Advisors Act of 1940 (the "Advisors Act") [15 U.S.C. §

---

[14]In SEC v. Jones, the District Court considered whether the permanent injunction sought by the SEC could be characterized as a penalty subject to the five-year limitations period in 28 U.S.C. § 2462, rather than merely as a form of relief aimed at protecting the public from future harm. In holding that the permanent injunction in that case could only be characterized as a penalty, the Court noted that "[h]ere, as in many securities cases, the potential collateral consequences of a permanent injunction are quite serious. The practical effect of such an injunction would be to stigmatize Defendants in the investment community and significantly impair their ability to pursue a career. In fact, a permanent injunction would provide authority for the Commission to seek to permanently bar Defendants from the investment advisor industry." 476 F.Supp.2d at 385.

80b-6(2)].  In addition, defendant DiBella is ordered to disgorge $374,500, plus pay prejudgment interest on this sum in the amount of $307,127.45.  Finally, DiBella is ordered to pay a civil penalty of $110,000.  The Court declines to impose a permanent injunction and officer/director bar against DiBella.


                              SO ORDERED


                              _____/s/_____

                              ELLEN BREE BURNS

                              SENIOR UNITED STATES DISTRICT JUDGE



Dated at New Haven, Connecticut this 13th day of March 2008.